## THE ARTHUR A. JOHNSON CORPORATION *vs.* COMMONWEALTH.

Suffolk. December 27, 1944. — March 30, 1945.

Present: FIELD, C.J., QUA, DOLAN, RONAN, & WILKINS, JJ.

*Warranty. Contract,* Building contract. *Evidence,* Extrinsic affecting writing. *Practice, Civil,* Auditor: findings; Exceptions: whether saved.

No express warranty relating to materials to be found in borrow pits from which material was to be taken for the building of an embankment for a dike could be added by extrinsic evidence to a contract in writing between the Commonwealth and a builder which showed on its face that it contained the entire agreement between the parties.

Even if it be assumed that, in making a certain contract for the building of an embankment for a dike, the Commonwealth through the metropolitan district water supply commission impliedly warranted that it had disclosed to the builder before he made his bid all the material information in its possession relative to subsoil conditions in a borrow area, the question, whether there had been a breach of such implied warranty, was one of fact, and the evidence warranted findings by the judge that plans showing borings "were true and accurate portrayals of the area concerned," that a careful examination of them, shovel cuts and other data by an experienced engineer would have revealed a condition which caused the builder great difficulty in excavation, and that there had been no breach of the implied warranty.

Upon evidence set out in a bill of exceptions, no substantial error appeared in action by a judge who, after he had ruled that every finding of an auditor, whose findings were not to be final, was conclusive evidence in the absence of any evidence that would warrant a contrary finding, denied requests for rulings that certain paragraphs of the report and certain particular sentences therein were not contradicted or controlled by any evidence at the hearing.

An exception to an interlocutory order made at the beginning of the trial of a proceeding against the Commonwealth under G. L. (Ter. Ed.) c. 258, not saved until the trial had ended and a finding had been made, was too late and was ineffectual, although purportedly incorporated in a bill covering the exceptions saved at the trial.

A contractor with the Commonwealth, petitioner in a proceeding under G. L. (Ter. Ed.) c. 258 for damages based solely on an alleged breach of a warranty of full disclosure to him of facts upon which he was asked to bid for the contract, was not entitled to recover a portion of the contract price still unpaid.

PETITION, filed in the Superior Court on April 6, 1938.

The case was heard by *Hammond,* J.

In this court the case was submitted on briefs.

*F. T. Leahy & G. I. Kellaher*, for the petitioner.

*R. T. Bushnell*, Attorney General, *& J. G. Bryer*, Special Assistant Attorney General, for the Commonwealth.

RONAN, J.   This is a petition under G. L. (Ter. Ed.) c. 258 to recover damages for an alleged breach of warranty by the metropolitan district water supply commission that it was honestly and truthfully disclosing to the petitioner all of the information in its possession to be used by the petitioner as a basis for the bid upon which it was awarded a contract for the construction of an embankment for the dike of Quabbin Reservoir in Enfield and Ware. The petitioner contends that the commission concealed information in its possession as to the nature of the subsoil in certain borrow pits from which the material was to be obtained for the construction of the embankment. If damages may not be recovered on this ground, then it alleged that the petitioner is entitled to rescind the contract and to recover by way of quantum meruit. The case was referred to an auditor whose findings of fact were not final. *Arthur A. Johnson Corp.* v. *Commonwealth*, 306 Mass. 347. He found for the petitioner in the sum of $285,139.56. The evidence in the Superior Court consisted of the auditor's report, numerous exhibits, and the testimony of witnesses, many of whom had not testified before the auditor. The judge found for the respondent. The case is here on various exceptions taken by the petitioner.

The commission in October, 1934, advertised for bids for the construction of the embankment of the dike, and notified bidders that bids would be received up to two o'clock on the afternoon of November 13, 1934. In response to a request of the petitioner, the commission sent it a printed booklet which contained (a) three printed pages of information for bidders, (b) a form for submitting a bid, (c) the form of the proposed contract, (d) the form of the bond, and (e) fifteen reduced-size plans, and also a mimeographed booklet entitled "Studies of Construction Methods." The information for bidders, among other things, stated that materials for constructing the embankment were available

on lands of the Commonwealth in the vicinity of the work; that the locations of these borrow areas, which from then present indications were expected to yield suitable materials, were shown on the plans but that each bidder must inspect these areas carefully to form his own opinion as to the amounts and character of the materials likely to be encountered and the conditions affecting their excavation, transportation and disposition; that borings and test pits had been made with reasonable care and at substantially the places shown on the plans; that shovel cuts had also been made so as to permit the further examination of the materials in the prospective borrow areas; and that records of bore holes, test pits, shovel cuts, samples of materials taken from them and laboratory analyses of them could be seen at the office of the commission. "There is, however, no expressed or implied guarantee as to the accuracy of such borings, test pits, shovel cuts, sluicing tests, laboratory analyses or studies, or of records or of interpretations of them." Each bidder was to form his own opinion of the character of the materials to be excavated and make his own interpretation of the borings, test pits and shovel cuts, and must satisfy himself by his own investigations and research "and make his bid in sole reliance thereon." The proposal submitted by the petitioner stated that "this proposal is based solely on . . . [its] own investigation and research and not in reliance upon any plans . . . borings, test pits, shovel cuts . . . or representations of any employee, officer or agent of the Commission." Four available borrow areas were shown on one of the fifteen plans above mentioned. As only about ten per cent of the material was excavated from area G and the remainder from area C, we are principally concerned with the nature of the subsoil in area C. Two cuts had been made in area C by power shovels before the contract was advertised. One cut, C, was one hundred forty feet long and had a maximum depth of twenty feet, and the other cut, F, was one hundred thirty feet long and had a maximum depth of twenty-eight feet. The side walls of these cuts were vertical in a rough sense. The floor of each cut was level and the greatest

depth of the cuts was at the end as the shovels excavated into this borrow area, which was a hill or ridge.

There was evidence that the commission, in order to determine the type of construction of the main dam on the Swift River and the dike in question at Beaver Brook, had a geological survey made of the surrounding territory. The dam and dike might be constructed of masonry, or they might be built with a concrete core and earth embankments on the sides if an adequate supply of suitable material for the embankments could be found in the vicinity. The geological survey disclosed that the territory was of glacial origin and that certain hills or ridges, including the four borrow areas mentioned, were composed of ground moraine or glacial drift. This drift composed the overburden and covered the rock in this region. There were deposits or pockets of sand, gravel, clay or other material known as modified or assorted drift, and the rest of the overburden was comprised of unassorted or mixed materials such as sand, gravel, clay, rock flour and boulders, known as glacial till. Borrow area C "was made up of all sorts of fragments, boulders, pebbles, sand, clay and flour mixed together, sizes varying from fine material on the one hand to boulders several feet across as the largest." This type of material was described by the one who made the survey as mixed materials. Besides the two shovel cuts, the commission had test pits and borings made in this area. The boring inspector recorded that hardpan had been found in the first hole which had been drilled in borrow area C. Hardpan could be found to be a heterogeneous mixture of rock flour, sand, gravel and boulders which is more or less cemented together of varying degrees of density and cohesiveness. All of the boring records except those of this first hole used the term mixed materials. The boring plans which were furnished to the petitioner classified the materials taken from the bore holes as muck or peat, loam, boulders and rocks, and also divided the material into nine classes, to wit: (1) gravel, uniform; (2) coarse sand, uniform; (3) coarse sand, variable; (4) medium sand, uniform; (5) medium sand, variable; (6) fine sand, uniform;

(7) fine sand, variable; (8) rock flour or silt, uniform; and (9) rock flour or silt, variable. There was one other class designated "M. M.," that is, mixed materials, which was stated in general to consist of "class 7 or class 9 — average about 6 or 7 per cent under the .01 mm. [millimeter] size." These plans also bore the legend that the "geological data shown on this sheet is [are] an interpretation of the samples and is [are] indicative, only of the types of materials encountered. The accuracy of such interpretation is not guaranteed and the bore hole, test pit and shovel cut samples may be seen at the office of the engineer at Enfield, Mass., so that any party may form his own opinion as to the amounts and character of materials likely to be encountered." These plans made no express mention of hardpan.

The contention of the petitioner is that the boring plans represented that the borrow area was composed of rock flour, sand and gravel — materials that could be easily excavated — but that the area contained a large amount of hardpan, as the commission knew but did not disclose to the petitioner. It is plain that the nature of the subsoil in the borrow area was important for the commission to ascertain because, unless there was a sufficient supply of suitable fill for the embankment for the dike, some other type of construction would be necessary. It was also important for the petitioner to know the character of the subsoil as it bore directly on the cost of excavating, and, unless the material was suitable for the construction of the embankment, the petitioner would not be paid for the excavation of such material, as the proposal called for a unit price per cubic yard for material excavated and placed in the embankment.

This is a proceeding under G. L. (Ter. Ed.) c. 258 against the Commonwealth. If the only cause of action the petitioner has is one in tort for deceit, then its claim is not within c. 258 and the Superior Court had no jurisdiction to entertain the proceeding. *Murdock Parlor Grate Co.* v. *Commonwealth,* 152 Mass. 28. *Burroughs* v. *Commonwealth,* 224 Mass. 28. *Glickman* v. *Commonwealth,* 244 Mass. 148.

The petitioner urges that its claim originated in contract and rests on a breach of warranty. The language of the "Information for Bidders" and the proposal above mentioned excludes any express warranty. The contract itself did not warrant the accuracy of the boring plans. Indeed, the contract contained a provision to the effect that the plans were not guaranteed to be correct and that no allowance would be made for any error in them. Where, as here, a written contract shows on its face that it comprises the entire agreement and was intended to be a complete and final statement of the whole transaction, then express warranties other than those contained in the contract cannot be added by extrinsic evidence. *Glackin* v. *Bennett*, 226 Mass. 316. *Western Newspaper Union* v. *Dittemore*, 264 Mass. 74. *Ernest F. Carlson Co.* v. *Fred T. Ley & Co. Inc.* 269 Mass. 272. *S. F. Bowser & Co. Inc.* v. *Independent Dye House, Inc.* 276 Mass. 289. *Whitty Manuf. Co. Inc.* v. *Clark*, 278 Mass. 370.

The auditor found and the judge ruled without objection by the respondent that the commission impliedly warranted that it had disclosed all the material information in its possession relative to the subsoil conditions in the borrow area C to the petitioner before it submitted its bid. The case was tried before the auditor and the judge on the theory that there was such an implied warranty. We take the case as presented by the parties. In view of the conclusion we reach, we need not decide whether, in the face of repeated warnings to the petitioner that it must draw its own conclusions about the character of the soil, there could be such an implied warranty in the instant case. See *Christie* v. *United States*, 237 U. S. 234; *United States* v. *Atlantic Dredging Co.* 253 U. S. 1; *Hersey Gravel Co.* v. *State Highway Department*, 305 Mich. 333; *Jackson* v. *State*, 210 App. Div. (N.Y.) 115.

We now turn to the findings of the judge. The judge adopted certain findings of the auditor, and upon all the evidence found that the boring plans were true and accurate portrayals of the borrow areas and were drawn according to well recognized and approved engineering practice; that

the shovel cuts revealed the true character of the subsoil in the area involved and disclosed numerous boulders deposited in and forming part of a geological formation known as glacial till; that the area ultimately excavated by the petitioner was almost entirely comprised of the same sort of glacial till as was disclosed by the shovel cuts and was a formation common to all of this general area; that glacial till, till and hardpan are practically synonymous; that the borings were made for the purpose of ascertaining where a quantity of material suitable for the construction of an impervious dike could be found; that the borings and shovel cuts revealed the fact that a large number of boulders would be encountered; that the method of classification of the material obtained from the borings was an accurate method for determining whether the material in the borrow area was suitable for use as impervious fill; that on November 2, 1934, Molineaux, a civil engineer in the employ of the petitioner, and Johnson, its vice-president, examined the shovel cuts and test pits and were informed that a contractor had had difficulty in excavating shovel cut C because of the presence of boulders; that on the next day they saw one Thomas, an engineer in the employ of the commission, and were shown a book containing the records of the borings, and the record of the drilling of one of the holes was explained in detail to them, including the amount of dynamite used in drilling the hole; that these boring records were open to examination by any bidder; that Thomas computed the time it took the contractor to make the shovel cut C; that the boring plans and shovel cuts furnished full information as to the difficulties likely to be encountered in making the excavation; that a careful examination of the plans furnished the petitioner or a careful examination of the shovel cuts and the surrounding territory by an experienced engineer would have revealed the fact that the overburden of the borrow area was a glacial till containing at least ten per cent of boulders, some of which were eight to ten feet in diameter; that the excavation of the areas would be a fairly difficult engineering project; and that the difficulty experienced by the peti-

tioner was due to the presence of boulders in this glacial
till and not to the fact that the term hardpan was not used
by the engineers of the commission.  He found that there
was no breach of any express or implied warranty, and
that neither the commission nor any of its representatives
made any false representation or concealed any informa-
tion whereby the petitioner was deceived or defrauded.

It could be found that the boring plans set forth cor-
rectly and accurately the composition of the materials
obtained from the borings, and that the classification of
these materials with reference to their granular content and
in accordance with the numbers appearing upon the plans
was true.  And the words "mixed materials" were un-
doubtedly the correct geological description of masses of
different materials mixed together in compact formation
commonly found in glacial deposits like the borrow area in
question.  This is what the petitioner contends should
have been described as hardpan.  There was much evidence
that these plans did not indicate that the material could
be easily excavated.  The plans were to be interpreted in
accordance with the matters appearing upon them consid-
ered in the light of what those matters would commonly
mean to one who was familiar with the subject matter to
which they related.  In this respect there was evidence
that an experienced contractor, like the petitioner, would
reasonably understand that the excavation would be diffi-
cult not only on account of the number of boulders but
also on account of the presence of material classified as 7
and 9; that the fine gradation of materials designated
by these numbers and boulders would indicate quite hard
compact material, and that the soil might be cemented
around the boulders.  The judge could accept this evidence
as true, although this evidence was considerably shaken on
cross-examination.  It also appeared in evidence that as a
rule the presence of rock flour indicates a cemented mate-
rial in this glacial country.  The judge could find that
these plans indicated the same thing to the petitioner.  It
was expressly found that they "were true and accurate
portrayals of the area concerned" and that a careful exam-

ination of the plans by an experienced engineer would have revealed the fact that the borrow area was composed of glacial till. These findings negative the petitioner's contention that it was deceived by the plans. In determining that question the judge was not confined to the plans alone but could consider all the other evidence. There was testimony that the material excavated from the borrow area C was almost entirely composed of the same sort of glacial till as was disclosed by the shovel cuts and that the shovel cuts clearly revealed the general nature of the subsoil in the area. Although allowance is made for the weathering of the sides of a shovel cut, it would seem that one could readily discover the exact nature and actual condition of the glacial deposits that comprised the sides and ends of the two cuts in this borrow area. In the next place, while some variation from the shovel cuts might be expected in the subsoil in the area in which the cuts were made due to glacial origin of the area, the testimony went to the extent of showing that the material that the petitioner excavated from borrow area C was absolutely the same as that which composed the walls of shovel cuts C and F. Before the petitioner made any bid, two of its representatives learned from Thomas the method and rate of boring and secured whatever information they requested. The judge found that these records, which showed the amount of dynamite used and the rate of drilling, were open to examination by all bidders with the privilege of making such copies and notes as they chose. Thomas also computed for them the time it took the contractor to excavate the shovel cut C. We need not further recite the testimony or refer to other and considerable testimony that pointed in another direction. Whether the boring plans, interpreted in the light of all the attending circumstances, constituted a misrepresentation of the subsoil of the borrow area, whether there was a concealment of the nature of this subsoil, and whether the petitioner was deceived by any such alleged misrepresentation, were questions of fact. It cannot be said that the general finding for the respondent cannot be supported on any rational view of the evidence

together with the permissible inferences.  The petitioner in the absence of fraud had no enforceable claim under either aspect of its petition.  *Bennett* v. *Thomson*, 235 Mass. 463. *Bartnett* v. *Handy*, 243 Mass. 446.  *Butler* v. *Martin*, 247 Mass. 169.  *Zintz* v. *Golub*, 260 Mass. 178.  *Heftye* v. *Kelley*, 262 Mass. 573.  *Brockton Olympia Realty Co.* v. *Lee*, 266 Mass. 550.

The petitioner filed sixty-seven exceptions to the rulings and findings of the judge.  The first thirteen exceptions were to the refusal to rule that certain paragraphs of the auditor's report or particular sentences in some of these paragraphs were not contradicted or controlled by any evidence introduced at the trial.  The judge had ruled that each and every finding of the auditor was conclusive evidence in the absence of any evidence that would warrant a contrary finding.  *Cook* v. *Farm Service Stores, Inc.* 301 Mass. 564, 566.  An examination of the entire testimony, including all the rational inferences of which it was susceptible, given by several witnesses, many of whom had not appeared before the auditor and some of whom were experts, shows that the action of the judge was right in denying all of these requests except in one instance.  This was the denial of the requested ruling that there was no evidence that controlled the findings contained in the twenty-ninth paragraph of the auditor's report.  This paragraph dealt with the work to be done under the contract and one of the purposes for which the borings were made.  No harm resulted to the petitioner from the refusal to give this request because the judge upon ample evidence expressly found the purpose of making the drill holes, which in fact was one of the purposes found by the auditor, and it is too obvious for discussion that the judge fully understood the work required to be done by the petitioner under the contract.  It is to be noted that some of the findings included in these paragraphs were substantially followed by the judge in his findings.  It is also to be noted that several of these requests related to the subject of damages which have now become immaterial.  The last one was based upon facts not found.  It would unduly lengthen this opinion

to deal with each separate exception by setting out the
evidence at the trial relative to the point involved and
comparing it with the particular subsidiary finding of the
auditor. We are satisfied that no substantial rights of the
petitioner were impaired by the denial of any of these re-
quests, and that no reversible error has been shown.

The petitioner was not entitled to a ruling that upon all
the evidence there was a breach of an implied warranty by
the respondent, because on the evidence this was at most
a question of fact. The fourteenth exception, which was
to the denial of this ruling, cannot be sustained. The
fifteenth and sixteenth exceptions, which were to the re-
fusal to grant requests which were based upon fraud,
became inapplicable when no fraud was found.

The judge adopted a finding of the auditor to the effect
that the petitioner in submitting its bid was compelled to
rely and did rely, and the commission knew it must and
would rely, in large part on the assumption that the boring
plans represented the subsoil conditions in the borrow area
as truthfully and accurately as they could be presented by
the commission in such plans. The seventeenth, eighteenth,
nineteenth, twentieth, twenty-first and thirtieth exceptions
were to the refusal to grant requests which in some instances
called for findings and in others for rulings and which in
substance were that hardpan was encountered in making
the borings, that the amount of dynamite used and the rate
of progress should have been stated on the plans, that the
absence of such information constituted fraud, and that
the petitioner had the right to assume that all material
information was disclosed by these plans. There was evi-
dence that these plans would indicate the existence of hard-
pan to an experienced engineer. The judge found that these
plans and the shovel cuts as well furnished full information
that the overburden was a glacial till containing boulders
and that the excavation would be fairly difficult, and that
the difficulty experienced by the petitioner in excavating
the area was due to the presence of boulders in the glacial
till and not to the fact that the term hardpan did not appear
on the plans. It would almost seem to be common knowl-

edge that the excavation of glacial till of the character revealed by the shovel cuts in this area would not be easy. If the judge believed that an experienced contractor who had examined the shovel cuts would not be misled by these plans, we cannot say that he committed any error of law in reaching that conclusion. The petitioner fails to show error in the denial of any of these six requests.

The twenty-second exception was to the denial of a request for a ruling that the respondent, having admitted in its answer that the borings were made to determine the subsoil conditions, must be held to have admitted that they were made to determine the looseness or compactness of the soil. The respondent, as all parties understood, was not interested in the removal of a hill or ridge but was interested only in obtaining fill for an embankment. It was interested in the composition rather than the formation of the subsoil. There was nothing in the answer that precluded the respondent from showing that the primary purpose of the borings was to disclose the granular nature of the material and not the looseness or compactness of the soil. Furthermore, this request became immaterial in view of the findings that the plans were prepared in accordance with good engineering practice, that a careful examination of them by an experienced engineer would disclose that the borrow area was glacial till containing boulders, and that excavation of this area would be fairly difficult.

The twenty-third, twenty-fourth, twenty-fifth and twenty-sixth exceptions were to the denial of requests for rulings which were to the effect that the plans should have disclosed that "mixed materials" were used as a synonym for "hardpan"; that as the plans showed that the material obtained from the drill holes was sand, gravel, rock flour and silt — words that were well known and commonly understood, *Brown* v. *Brown*, 8 Met. 573; *Hatch* v. *Hawkes*, 126 Mass. 177 — the plans constituted a misrepresentation of the subsoil. No one contends that the materials removed were not found in the places designated on the boring plans. But as already pointed out, the presence of such materials could be found to indicate to experienced engineers, like those in the

employ of the petitioner, the nature and formation of the soil from which they were taken. The judge was right in refusing these requests.

The twenty-seventh and twenty-ninth exceptions were to the denial of requests which were based upon a selected group of parts of the testimony dealing with subject matters concerning which there was other and conflicting testimony. Furthermore, it is apparent that the judge adopted the other and conflicting testimony as true, as he had the right to do.

The plans showed that the boring materials were classified into nine groups. It was immaterial that the petitioner did not know the name of the system in accordance with which such classification was made. The twenty-eighth exception, which was to the denial of a requested ruling that the petitioner had never heard of this system of classification, cannot be sustained. The thirty-first exception to the refusal of a request for a ruling in reference to interest has also become immaterial.

Exceptions 32 to 67, inclusive, purport to challenge the correctness of findings of fact made by the judge and his failure to make other and additional findings. None of these exceptions raises any question for review. *Federal National Bank* v. *O'Connell*, 305 Mass. 559. *Sreda* v. *Kessel*, 310 Mass. 588. *Matter of Loeb*, 315 Mass. 191, 194.

At the beginning of the trial the petitioner presented a motion to confirm the auditor's report. The petitioner contended that the report should be considered as a master's report in so far as it pertained to the rescission of the contract. The reference to the auditor was in the usual form and it did not provide that his findings should be final. The respondent seasonably filed a reservation to introduce further evidence at the trial. *Arthur A. Johnson Corp.* v. *Commonwealth*, 306 Mass. 347. The judge ruled that the case was before him for trial on the merits, denied the petitioner's request that the hearing proceed on the motion to treat the auditor's report as a master's report and to confirm the report, and stated in substance that he would consider the report as one where the findings of fact of an

auditor were not final. This was the equivalent of the denial of the motion to confirm the report. There is nothing in the record showing that the petitioner then took any exception. *Phillips* v. *Director General of Railroads*, 251 Mass. 263, 268. The claim of exceptions filed after the trial had ended and after the judge had made a finding for the respondent was filed too late. *New Bedford Cotton Waste Co.* v. *Eugen C. Andres Co.* 258 Mass. 13. The allowance of the bill of exceptions did not give life to the petitioner's exception which never existed. *Looby* v. *Looby*, 303 Mass. 391.

The auditor found that the petitioner has been paid all the contract price except $1,000. The petitioner contends that it refused to accept this balance because to do so would under the terms of the contract constitute a release of the Commonwealth and that, therefore, the judge was in error in finding for the respondent. The recovery of this sum was not within the scope of the petition. The finding for the respondent must be presumed to have been based on the pleadings. There was no error. *Spritz* v. *Brockton Savings Bank*, 305 Mass. 170, 171. *Glynn* v. *Blomerth*, 312 Mass. 299, 302. *Manning* v. *Loew*, 313 Mass. 252, 254. *Payne* v. *R. H. White Co.* 314 Mass. 63, 67.

*Exceptions overruled.*