## L. J. McNULTY, INC. v. VILLAGE OF NEWPORT. BANISTER ENGINEERING COMPANY AND ANOTHER, THIRD-PARTY DEFENDANTS.

187 N. W. (2d) 616.

April 16, 1971—No. 42291.

---

118

Thomas, King, Swenson & Collatz, George C. King, and Carl A. Swenson, for appellant.

Peterson & Popovich and Fred N. Peterson, for respondent village.

Meagher, Geer, Markham & Anderson, Mary Jeanne Coyne, and O. C. Adamson II, for respondent Banister.

Lawrence E. Lenertz and Bentson & Kalina, for respondent Blake.

Heard before Knutson, C. J., and Nelson, Otis, Peterson, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

This action was commenced in the District Court of Washington County by plaintiff, L. J. McNulty, Inc., against the village of Newport to recover damages of $100,710 by reason of false information furnished plaintiff by the village, on which informa-

tion plaintiff based a construction bid. The village joined as third-party defendants its consulting engineer, Banister Engineering Company (hereinafter referred to as Banister), and Blake Engineering Company (hereinafter referred to as Blake), a firm engaged in the business of making soil borings.

The case was tried before the court, without a jury, in October 1968. By agreement of the parties, the question of liability was tried separately, the question of damages being reserved for future determination. At the close of plaintiff's case, the court granted defendants' motion for judgment of dismissal. Plaintiff subsequently moved that the order for judgment entered April 25, 1969, and the judgment entered pursuant thereto be set aside and the case be reopened to take additional testimony or for a new trial. On October 14, 1969, the trial court filed its order denying plaintiff's motion.

The pertinent facts appear to be as follows: In the fall of 1959 defendant village contracted with Banister for engineering services in connection with a contemplated program of sanitary sewers, sewage treatment plant, water mains, and supply and storage systems. Sometime prior to October 1962, Banister prepared a feasibility report outlining the proposed construction and its estimated cost.

A rock formation of Shakopee-Oneota limestone lies beneath the village of Newport, and in many places the rock comes close to the surface and is covered with only a thin layer of sand and gravel. It was evident that in order to properly estimate the costs and to design a sewer and water system for the village, determinations as to the below-surface rock conditions had to be made. Seventy soil borings and seismic soundings of the area had been obtained at an earlier time by the village to determine subsurface rock conditions, but Banister recommended that more borings be taken to determine the location of rock. On the basis of Banister's recommendation, defendant village hired Blake to take soil borings.

Blake was furnished an ordinary street map of the village showing where the sewer and water lines were to be laid and was instructed to make borings at street intersections and, in areas where it encountered obstructions, at midblock points in the shorter blocks and at 200-foot intervals in the longer blocks. The job was commenced in January 1963 and took approximately a month. Blake made the borings with a hydraulically operated drill consisting of a 6-inch auger equipped with a carbide bit. The boring points were taken within the street right-of-way, just off the edge of the blacktop, and about 12 feet from the centerline of the road.

Blake's method of operation was to drill a hole until the drill met resistance and then to withdraw it from the hole and record the depth the bit had penetrated. If the bit had limestone dust on it, Blake identified the obstruction as limestone. If it did not, Blake characterized the obstruction as something other than limestone and identified it as "boulder." In all, Blake made borings at 206 points and plotted these depths on the street map provided by Banister.

Banister used this boring data for planning and designing purposes in the preparation of the final plans. The data was plotted on plan profile sheets which illustrated the project in two forms —a view from the top in the form of a map or plan showing adjacent property, the location of buildings and existing utilities, and the location of the proposed sewer and water systems; and a view from the side of the street in the form of a profile showing the elevation above sea level of the centerline of the street and the elevation of the proposed water and sewer systems. After Blake's drilling points were plotted, the points were connected with straight lines to make up a "rock profile" which was included in the side-view aspect of the plan profile sheets.

Banister used the rock profile to make adjustments and alterations in previous plans for the system. The cost estimate submitted by Banister with the original feasibility report was also modified as the plans were changed, and the final cost estimate

for the system of sanitary sewers and water mains arrived at was $1,070,000. All of this information was furnished to defendant village prior to the letting of any contracts to begin construction on the project.

In May 1963, the village of Newport advertised for bids. It furnished plans and specifications, including the rock profile sheets, to bidding contractors sometime after May 16, 1963. Bids were opened on June 7, 1963, and a contract for the sewer and water systems was awarded to plaintiff, who was the low bidder at $1,010,416.

Plaintiff commenced work July 8, 1963, and almost immediately began complaining to Banister's project engineer that rock was being found at a higher level at the construction site, the center of the street, than was shown on the plans of the project. The job went forward; however, plaintiff and Banister's engineer agreed that field notes of the rock depth found in the trenches dug out by plaintiff's crews would be kept. Thereafter, measurements were taken from the top of the ground down to the level of rock at 25-foot intervals along the trench site. These measurements were recorded in field notebooks and were plotted on "As-built" plans as the work progressed.

Some months after the job was commenced, Blake was asked to return and make some more borings in an effort to discover the reason for the discrepancies between the rock level plotted from Blake's borings and shown on the project plans, and the rock level found in the trenches at the center of the street. Blake made seven borings near areas where original borings had been taken. The reborings for the most part showed rock elevations at points corresponding to Blake's original data—some below and some above the elevations shown by Blake.

The controlling issue on this appeal is whether a rock profile presented to bidders on a sewer construction contract and plotted from soil borings which accurately measured depth of rock along a line parallel to but 12 feet to one side of a proposed trench constitutes actionable misrepresentation of the depth of rock in the

trench when later excavation of the trench revealed material inconsistencies between the depth of rock found there and the depth found at boring points making up the profile.

A false or fraudulent representation of a material fact, made with the intent that it be acted upon, may indeed be actionable if another person is thereby induced to act or justified in acting to his detriment. However, in the instant case, the trial court found that defendant village had not misrepresented any material fact or otherwise defrauded or misled plaintiff into entering into the contract for the construction of a sewer and water system.

That defendant village is built atop a formation of limestone is a matter of common knowledge. The final plans and specifications for the water and sewer project very precisely describe the circumstances giving rise to the presence of the rock profile on the plans. The specifications state:

"BORINGS: Because the Village of Newport is underlaid with the Shakopee-Oneota limestone formation which comes close to the surface in many places, borings were taken to determine the depth to rock. Generally, borings were taken at street intersections and midpoints on short blocks; and every 200 feet on long blocks where rock was encountered at sewer depth. Borings were taken by Blake Engineering Company of Minneapolis using a carbide tipped bit. Depth to rock was determined by the inability of the drill to penetrate further *and* the bringing up of pieces of limestone by the bit. In cases where the bit hit obstructions during several attempts, but no limestone was brought up, the obstructions were called boulders.

"ROCK PROFILE: The results of the borings were plotted on the profile drawings and connected with straight lines; the result is the shaded line on the profile which is called the 'Rock Profile'. This rock profile was used for design purposes and has been left on the drawings for the assistance of bidders. *These profiles are not guaranteed to be indicative of any ground except*

*at the particular and exact locations of the borings. No claim
shall be made or be considered resulting from any deviation from
the boring data or the rock profiles.*

"ROCK EXCAVATION: Compensation for rock excavation shall
shall be included in the unit prices for pipe in place, as there will
be no separate payment for rock excavation." (Italics supplied
in part.)

As can be seen, the specifications disclosed why and where the
soil borings were taken, who took them, and what they were in-
tended to mean.

There is authority to the effect that, in the absence of anything
further by way of deception, boring sheets themselves, or the
results of borings as noted on plans or otherwise, if they present
only the findings at the points of the borings, are not representa-
tions of subsurface conditions in general. The borings are but
indications from which the parties may draw inferences. How-
ever, the line between the mere presentation of the results of
point borings and the representation of *general conditions* based
on such borings is crossed where the owner's engineers show
profile maps, or notations on plans, purporting to give subsoil
conditions in general.

In Elkan v. Sebastian Bridge Dist. (8 Cir.) 291 F. 532, a con-
tractor contracted with defendant district to construct a bridge
from a point at Fort Smith, Arkansas, across the Arkansas River
to Oklahoma. After he had built a considerable portion of the
bridge, he ceased work and brought an action for cancellation
of the contract and for an accounting in relation to the work
done, alleging mutual mistake and misrepresentation by defend-
ant about certain subsoil conditions. Although soil borings had
been made at places near the site of a proposed pedestal of the
bridge, the contractor had encountered quicksand at the pedestal
site, rendering excavation costly. The court held that the con-
tractor could not maintain a suit to annul the contract and re-
cover in quantum meruit for what work he had done. The court,
discussing the significance of the borings, said (291 F. 538):

"* * * The borings were merely indications, at certain places and to certain depths, from which deductions might be drawn as to actual conditions along the line and to the depths of such borings. Both parties knew that deductions so drawn might prove untrue when the necessary excavations were made.

"The question here is who took the risk of these deductions? Either the district or the contractor must take this risk. Either could legally do so. Construction of the contract in the light of applicable legal principles must determine which did. That the district made known to Elkan the result of the borings is certain. This was done with one of two purposes: (1) To be the statement of a fact (sub-soil conditions to be encountered) upon which he might rely and act; or (2) as useful information which he might accept as sufficient or not as he thought wise, leaving him to make such further and other investigation as he might wish. The fact that Elkan did accept such information as sufficient is no proof, one way or the other, that the district contracted with him that it would warrant the sub-soil conditions to be as indicated by the borings.

\* \* \* \* \*

"* * * From what are we to infer that it also stated, much less guaranteed, that the sub-surface conditions, where excavations were to be made, were revealed by the borings? The bare statement that the boring sheet may be relied upon as accurate is entirely different from saying that the sub-soil along the bridge line is as shown by the boring sheet. One is a statement that certain evidence of an ultimate fact exists; the other is a statement that the ultimate fact exists. The statement here made goes, in effect, little further than if the boring sheet had, without comment, been furnished the bidder. It would be of no value to anyone unless it were true and there would be no purpose in furnishing it unless it were furnished as a true showing of the borings. Moreover, the boring sheet was part of the data furnished by the engineers which concerned the foundations of the piers, abutments and pedestals and the statement is made that 'the data

furnished to the bidders by the engineers regarding of foundation * * * are to be considered as approximate and bidders must assume the risk of having to carry the foundations to a greater or less depth' at the same price schedule. Nor does the fact that the plans show the location of the borings and contain the boring sheet either add to or take away from this conclusion."

Likewise, in Bates County v. Wills (8 Cir.) 190 F. 522, it was held that a profile of soundings was not a representation that all the materials in the proposed site consisted of the material shown at the points where soundings were made. See, also, Arthur A. Johnson Corp. v. Commonwealth, 318 Mass. 88, 60 N. E. (2d) 364; Inland Const. Co. v. City of Pendleton, 116 Ore. 668, 242 P. 842.

Plaintiff's whole case rests upon its conclusion that the borings taken by Blake, plotted by Banister, and released with the plans of the project to bidders by defendant village were false representations. But these borings were never shown to be false. Even if on a new trial plaintiff were allowed to introduce the proposed testimony of a geologist as an expert witness, it is doubtful that the witness could supply any information that would place these borings in doubt.

Whether the village "guaranteed" the borings or not does not seem to be particularly relevant in this case. Plaintiff claims the borings were a representation that the rock level in a trench 12 feet away would be the same as that at the borings. The contract specifications distinctly disclaim this.

Among other cases, plaintiff cites E. & F. Const. Co. v. Town of Stamford, 114 Conn. 250, 158 A. 551. There, the plaintiff, a contractor, submitted a bid to build a high school and, after negotiations, was induced to include the cost of rock excavation in its lump-sum bid. Among the plans for the job was a boring sheet which showed borings distributed over the entire site. The boring sheet made a pronouncement of rock and soil conditions over the site and showed rock at only certain positions. Plaintiff hit rock where it was not shown on the boring sheet and went to addition-

al expense and time to excavate the rock. In its action to recover for the additional expense, a court-appointed committee found as facts that the sheet containing data on boring had been prepared to inform builders of a general subsurface condition on the site and that this information was false and misleading because it disclosed no rock except where signified on the sheet. The committee recommended plaintiff be allowed to recover the excavation expense. The district court accepted the committee's findings of fact but ordered judgment for defendant city. The Supreme Court of Connecticut reversed, holding that the statement in the specifications as to the nature of the subsoil beneath the school was in the nature of a warranty. There the court stated (114 Conn. 260, 158 A. 554):

"* * * The report of the committee makes it clear that the purpose of these representations was to supply information to bidders upon the job who were expected to act upon it, and entitled to act upon it, in making their bids. They purported to be based upon actual investigation of the subsurface conditions by competent engineers, were adopted by the defendant as its own, and carried with them the assertion of superior knowledge and information. They were authoritative and misleading. The plaintiff was entitled to rely upon them and did rely upon them and was induced by them to enter into the contract."

However, the facts upon which the Connecticut court reached its decision are dissimilar to those presented in this case. Here, the defendant village held out the borings and rock profile to be indicative of rock depth *only* at the particular and exact locations of the borings. Similarly distinguished is Stanton v. Morris Const. Co. 159 Minn. 380, 199 N. W. 104, where Pine County represented the material at the bottom of the Willow River to be sand and gravel, whereas in reality it consisted of logs, slabs, large rocks, and debris of various kinds. This court allowed recission of a contract for construction of a bridge. McCree & Co. v. State, 253 Minn. 295, 91 N. W. (2d) 713, is also distinguish-

able from the instant case. In that case the contractor was permitted to recover damages resulting from a defect in the plans which called for an impossible performance and from failure of the Department of Highways to cooperate so that the contract could be performed. This court distinguished that type of situation from the one presented in the instant case by quoting the rule stated in United States v. Spearin, 248 U. S. 132, 136, 39 S. Ct. 59, 61, 63 L. ed. 166, 169 (253 Minn. 309, 91 N. W. [2d] 722):

"* * * Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered."

The rule is applicable here.

Plaintiff also cites a number of United States Supreme Court decisions to buttress its proposition that defendant village misrepresented the soil borings and rock profile. MacArthur Bros. Co. v. United States, 258 U. S. 6, 42 S. Ct. 225, 66 L. ed. 433, was an action by a contractor against the United States for breach of contract growing out of alleged misrepresentation. The claimed misrepresentation was that certain parts of a canal, being constructed under the contract, could be done in the "dry." It turned out that such construction could not be done in the "dry." The court held that the United States made no representation that the work could be done in the dry and that the contract expressly required the contractor to acquaint himself with the conditions. The court, after distinguishing Hollerbach v. United States, 233 U. S. 165, 34 S. Ct. 553, 58 L. ed. 898; Christie v. United States, 237 U. S. 234, 35 S. Ct. 565, 59 L. ed. 933; and United States v. Atlantic Dredging Co. 253 U. S. 1, 40 S. Ct. 423, 64 L. ed. 735, said (258 U. S. 12, 42 S. Ct. 227, 66 L. ed. 436):

"The elements which existed in each of the cited cases are absent from the case at bar. In the case at bar the Government undertook a project and advertised for bids for its performance.

There was indication of the manner of performance but there was no knowledge of impediments to performance, no misrepresentation of the conditions, exaggeration of them nor concealment of them, nor, indeed, knowledge of them. To hold the Government liable under such circumstances would make it insurer of the uniformity of all work and cast upon it responsibility for all of the conditions which a contractor might encounter and make the cost of its project always an unknown quantity. It is hardly necessary to say that the cost of a project often determines for or against its undertaking."

United States v. Atlantic Dredging Co. *supra*, was an action to recover for loss incurred because of misrepresentation as to the character of material to be encountered in dredging work. The basis of that decision, by a divided court, is that false statements were made as to the character of the material and the statements were based on boring maps which did not truthfully reveal results of the borings. There was concealment of facts concerning the borings which created a false impression, and the government permitted the contractor to embark upon the work with full knowledge that he was relying on the false statements and map. In the instant case there were no false statements or false boring sheet.

United States v. Spearin, *supra*; Christie v. United States, *supra*; and Hollerbach v. United States, *supra*, are all based on misrepresentations which were the bases of contracts. These decisions have no application to this case because plaintiff has shown no misrepresentation.

In the instant case the lower court found as a fact that defendant village had not misrepresented any material fact or otherwise defrauded or misled plaintiff into entering into the contract for the construction of a sewer and water system. This finding of fact is amply sustained by the evidence, which demonstrates clearly that the plans and specifications were precisely what they purported to be. In fact, the village simply put all its cards on the table and in the specifications told the bidders what infor-

mation was included in the plans, where it came from, who prepared it, how it was prepared, and why. The village even pointed out what the information was not. It made full disclosure in the plans and specifications. Thus, the village of Newport did not defraud plaintiff. A discussion of fraud is inapposite in the absence of a false representation.[1]

Since the initial building block of plaintiff's case, the alleged falseness of the borings and rock profile, has not been shown to be a misrepresentation from which an action would follow, we need not discuss the other issues raised on this appeal. The trial court's order is affirmed.

Affirmed.

---

[1] See, Hanson v. Ford Motor Co. (8 Cir.) 278 F. (2d) 586, 590, as to the elements of an action for fraud.