**FATTORE COMPANY, Inc., Plaintiff-Appellant,**

v.

**METROPOLITAN SEWERAGE COMMISSION OF the COUNTY OF MILWAUKEE, Defendant-Appellee.**

No. 71-1350.

United States Court of Appeals, Seventh Circuit.

Dec. 15, 1971.

Rehearing Denied Jan. 10, 1972.

**538**

Richard W. Cutler, Elwin J. Zarwell, Milwaukee, Wis., for appellant.

Harvey G. Odenbrett, Ewald L. Moerke, Jr., Milwaukee, Wis., for appellee.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

CASTLE, Senior Circuit Judge.

This diversity action was brought by the plaintiff-appellant, Fattore Company, Inc., a construction contractor to recover additional compensation for work done on a sewer construction contract awarded plaintiff by the defendant-appellee, Metropolitan Sewerage Commission of the County of Milwaukee. The issue of liability was separated from the issue of damages and tried to the court without a jury. The District Court filed a memorandum decision, 324 F.Supp. 354, incorporating its findings of fact and conclusions of law, and entered judgment in favor of the defendant dismissing plaintiff's action on the merits and awarding costs to the defendant. The plaintiff appealed.

The contract involved was for the construction of approximately 6,600 lineal feet of 12 foot diameter monolithic sewer approximately 100 feet below ground level. Plaintiff's complaint seeks recovery of additional costs incurred in the performance of the contract. It alleges

that these costs were incurred because the ground conditions encountered in the tunneling materially differed from the conditions shown by test borings furnished to bidders by the defendant. The complaint predicates a right to such recovery on a "changed conditions" clause of the contract, and also on the independent grounds of misrepresentation and breach of warranty. Defendant's answer, inter alia, denies the applicability of the "changed conditions" clause and interposes an affirmative defense based on alleged acceptance of "final payment" by the plaintiff. Defendant asserts that under a provision of the contract such acceptance operated as a release barring the plaintiff's claim.

 From our review of the record, considered from the aspect of the respective contentions advanced on appeal by each of the parties, we are satisfied that the District Court's findings of fact and conclusions of law, insofar as they bear upon and reject both misrepresentation and breach of warranty as independent grounds for recovery by the plaintiff, are, respectively, neither clearly erroneous nor the result of the application of incorrect legal criteria.[1] We therefore turn to an examination and consideration of the court's findings and conclusions as they relate to the court's ultimate holdings that the "changed conditions" clause of the contract affords no basis for recovery by the plaintiff and that, in any event, an acceptance of "final payment" by plaintiff bars suit on its claim. As a preface to such examination and consideration the pertinent facts disclosed by the record are summarized as follows.

Prior to the bidding, the plaintiff and other bidders were furnished with copies of the proposed contract documents, including a "Plan and Profile" which indicated among other things, the route of the sewer, the depth of the work, the logs of seven test borings taken at 1,000 foot intervals at points offset varying distances from the actual planned location of the sewer, and the locations of the points at which the test borings were made. The reason the test borings were offset from the line of the sewer was so that the holes would not intersect or be too close to the actual tunnel so as to alleviate the risk of blowouts in the event the contractor had to pressurize the tunnel with compressed air during the work —a common practice to assist in keeping water out. The "Instructions to Bidders", one of the contract documents, recited that the defendant had made test borings to determine the character of the ground "likely to be encountered", that such information was available to the bidders, but that the defendant "did not guarantee that . . . the character of the ground is uniform between borings" and its engineers anticipated that "there will be variations in the character of the ground between the test borings. It was further stated that each bidder was expected to ascertain the character of the soil through which the work was to be done.

The defendant's test borings disclosed clay, coarse sand and gravel to be the character of the soil down to the 100 foot underground level—the floor of the proposed sewer tunnel. In reliance on the borings furnished by the defendant, the plaintiff's bid was predicated on the use of the shield method of tunneling and the utilization of deep wells for any necessary dewatering. However, the actual underground conditions encountered in the performance of the work differed materially from those indicated by the defendant's test borings. Solid rock and mixed face were encountered at the sewer grade throughout the first 496 feet of the tunnel. Therefore, the shield method of tunneling and constructing the concrete sewer had to be abandoned, and once abandoned, it is impossible to again begin using the shield when conditions

---

1. See: L. J. McNulty, Inc. v. Village of Newport (1971), 290 Minn. 117, 187 N. W.2d 616, where the action was based solely on alleged "misrepresentation"— not on a "changed conditions" clause.

permit. The plaintiff was unable to use the shield and as a result the tunneling costs were substantially increased. In addition, the presence of silt and fine sand, as well as bedrock at or immediately below the sewer grade, frustrated the use of deep wells and dewatering costs increased. The attention of defendant's Engineer was immediately called to the conditions encountered, and a request for additional compensation made, before the work proceeded.

Paragraph 20 of Section I of the contract's General Conditions provides:

"20 *Changed Conditions.* Should the Contractor encounter, or the Sewerage Commission discover during the progress of the work, subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention of the Engineer shall be called immediately to such conditions before they are disturbed. The Engineer shall thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the drawings, or indicated in the specifications, he shall at once make such changes in the drawings and (or) specifications as he may find necessary and any increase or decrease of cost and (or) difference in time resulting from such changes shall be adjusted as provided in Paragraph 19 of this contract."

Paragraph 19, to which Para. 20 makes reference, authorizes the defendant's Engineer to at any time make changes in the contract specifications by written order, and provides that if such changes cause an increase or decrease in the amount due under the contract "an equitable adjustment shall be made and the contract shall be modified in writing accordingly".

Work on the tunneling commenced May 11, 1961. After encountering the underground conditions which materially differed from those disclosed by the test borings, the plaintiff on May 17, 1961 and again on June 13, 1961 made written requests to the defendant's Chief Engineer for a price adjustment because of the increased costs of doing the work. When work on the contract was completed and the job accepted by the defendant in January of 1964, no action had yet been taken on the plaintiff's request for an adjustment.

The contract required periodic monthly payments on the basis of duly certified approved estimates of the work performed during the preceding calendar month by the contractor less a percentage of the amount of the estimate (10% when the amount of the estimate is $100,-000 or more) [2] to be retained by the defendant until final completion and acceptance of the work covered by the contract. Article 7 of the contract provides that the acceptance by the contractor of the final payment by the owner "shall be and shall operate as a release to" the defendant "from all claims and liabilities to the contractor for anything done or furnished for, or relating to the work, or for any act, neglect, fault or default of the owner or of any person relating to or affecting the work".

On February 25, 1964, prior to the payment for work done following the preceding monthly estimate (Estimate No. 37) and payment, plaintiff made a request by letter to the defendant that the retained percentage on the contract being withheld by the defendant be reduced in amount to $10,000 and advised that:

"Payment by the Sewerage Commission pursuant to the foregoing request and acceptance of such payment by Fattore Company Inc. is not to be construed as acceptance of final payment under the provisions of Article 7 of the Contract between the Sewerage Commission and Fattore Company Inc."

Subsequently, the defendant made a determination that $17,800 represented liquidated damages for which *plaintiff was*

---

2. 15% where the estimate amount is less than $100,000.

liable for failure to complete the work within the time specified in the contract, and on May 6, 1964, plaintiff wrote the defendant that plaintiff acceded to this deduction, but that:

"It is, however, expressly understood and agreed that Fattore Co., Inc. does not waive its right to present a claim for extra payment on its contract because of unusual and unexpected conditions encountered on the job. Rather, Fattore Co., Inc. expressly reserves to itself the right to present such a claim to the Commission and to pursue its legal remedies."

On May 20, 1964, the defendant's Chief Engineer presented "Estimate No. 38", which is captioned,

"MONTHLY ESTIMATE
For the period Ending May 20, 1964"

to defendant and recommended payment thereof upon the condition that the check for the amount shown due on the estimate ($273,774.15) be not released until the plaintiff furnished certain releases from material suppliers and subcontractors.

The Chief Engineer's recommendation was accompanied by a communication from defendant's acting legal advisor which advised that a letter received May 5, 1964, from plaintiff's attorneys:

". . . outlines a course of procedure for the release of a substantial portion of the 15% retained moneys. . . ."

Defendant's legal advisor after noting, among other things that plaintiff disputed an amount ($4,117.70) claimed to be due from the plaintiff to the Building Trades United Pension Trust Fund, and advising that such amount be withheld, recommended "that the procedure as set forth in the letter of May 5, 1964, from the attorneys for the Fattore Company be approved" and concluded with the following statement:

"There is some intimation that the Fattore Company will file a claim against the Metropolitan Sewerage Commission of Milwaukee County for additional compensation because of conditions encountered on this job not anticipated when the bid was submitted. This is not part of this transaction, and, consequently, no mention should be made of this matter in the present proceedings for completing payment on this contract."

Following the presentation of Estimate No. 38, the recommendations of its Chief Engineer, and the advisory communication of its legal advisor, the defendant adopted a resolution reciting that the defendant was holding the sum of $277,-891.85, which represented the retained percentage less the $17,800 in liquidated damages; directing the retention of $4,-117.70 until the dispute concerning its payment has been resolved; and authorizing delivery of defendant's check in the amount of $273,774.15 to the plaintiff upon the latter's furnishing the releases from material suppliers and subcontractors. Accordingly, payment of the $273,-774.15 "amount due on estimate" was made to plaintiff on June 18, 1964, and plaintiff acknowledged on the face of Estimate No. 38 that it "Received payment in the above amount." Estimate No. 38 is not described on its face as being a "Final Estimate" nor is the "amount due on estimate" characterized in any manner as representing the "final payment" on the contract. In this respect, Estimate No. 38 differs from the closing estimates made and used by the defendant in connection with four other contracts covering work on other portions of its sewer project. In each of these other cases the estimate was designated on its face as being "FINAL"; the Chief Engineer certified thereon that he "approve[s] this Final Estimate"; and the contractor acknowledges that it "accept[s] this Final Estimate as payment in full for Contract No. [number]".

The District Court found and concluded that even though plaintiff found the subsurface conditions different from those indicated by the test borings shown on the "Plan and Profile", and the conditions actually encountered increased

the plaintiff's costs, the plaintiff was not entitled to additional compensation under the contract. In this connection the court points to the exculpatory language contained in the "Instructions to Bidders" with respect to the test borings furnished by the defendant, and the caveat therein to the effect that each bidder was expected to ascertain the character of the soil through which the work is to be done, and concludes that the plaintiff was not entitled to rely upon the defendant's test borings in making its bid. In addition, the court reads Paragraph 20, Section 1 of the contract's General Conditions, quoted supra, as being limited in its application to a situation where the defendant's Engineer determines that the changed subsurface conditions encountered necessitate a revision of the plans and specifications and makes such revision in the drawings and (or) specifications, and that no such changes were made by defendant's Engineer in the case at bar. In our opinion the District Court clearly erred on both scores.

The defendant's test borings were incorporated as a part of the contract documents and specifications. In this respect the contract sets forth:

"Specifications

\* \* \* \* \* \*

4. Borings. The Metropolitan Sewerage Commission of the County of Milwaukee has made seven test borings along the route of that portion of the sewer in this contract. The logs and locations of these borings are shown on the drawings. . . ."

The sample borings were made available to the bidders, and are described in the contract documents as having been made "to determine the character of the ground likely to be encountered". Their disclosures with respect to subsurface conditions were thus "indicated in the specifications" as the conditions likely to be encountered by the successful bidder at the tunneling level. Certainly, the subsurface conditions actually encountered in the prosecution of the work "materially differ[ed] from those shown on

the drawings or indicated in the specifications" within the purview of that language as used in Paragraph 20. Moreover, in the presence of a "Changed Conditions" clause such as Paragraph 20, broad exculpatory clauses do not preclude the contractor-bidder from relying upon the existence of subsurface conditions of the nature indicated by the contract specifications. In this connection the observations made in Woodcrest Construction Company v. United States, 408 F.2d 406, 410, 187 Ct.Cl. 249 are apposite:

". . . Here, although there is no statement which can be made binding upon the Government, there was in effect a description of the site, upon which plaintiff had a right to rely, and by which it was misled. Nor does the exculpatory clause in the instant case absolve the Government, since: . . broad exculpatory clauses . . . cannot be given their full literal reach, and 'do not relieve the defendant of liability for changed conditions as the broad language thereof would seem to indicate.' Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 584 (1957), cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108. As Fehlhaber said, general portions of the specifications should not lightly be read to override the Changed Conditions clause Ibid. United Contractors et. al. v. United States, 368 F.2d 585, 598, 177 Ct.Cl. 151, 165–166 (1966)."

See also: Foster Construction C. A. and Williams Bros. Co. v. United States, (1970), 435 F.2d 873, 875, 193 Ct.Cl. 587.

▮▮▮ As heretofore pointed out, Paragraph 19 authorizes the Engineer to "at any time . . . make changes in the drawings and/or specifications of this contract and within the general scope thereof". This is so irrespective of whether or not subsurface conditions are encountered which materially differ from those indicated in the specifications or shown on the drawings. The District Court's interpretation of Paragraph 20

is to the effect that it conditionally authorizes the Engineer to make changes he has the unconditional authority to make under Paragraph 19. To so read Paragraph 20 would be contrary to the fundamental doctrine of construction recognized in Nelson v. Boos, 7 Wis.2d 393, 399, 96 N.W.2d 813, 817, where it is stated:

"A construction which renders meaningless a provision expressed in the contract or results in surplusage should be avoided if possible."

Properly applied these two contractual provisions give the defendant an option under circumstances such as are here involved. The defendant may under Paragraph 19 revise its plans and specifications so as to divert the course of the sewer in order to avoid the subsurface condition encountered or otherwise change the design so as to control the costs in the light of the condition encountered. But if the defendant elects, as it did in the instant case, to have the contractor continue the work through the subsurface conditions actually encountered, then the "Changed Conditions" clause, Paragraph 20, controls and entitles the contractor to an equitable adjustment of compensation in event the changed conditions encountered result in an increase in its costs. We reject, as erroneous, the District Court's holding to the effect that Paragraph 20 requires, as a condition precedent to the existence of a contractual right to an equitable adjustment in compensation to cover an increase in costs resulting from the encountering of subsurface conditions materially differing from those indicated in the specifications, that the defendant's Engineer make a revision of the

plans and specifications. Under the language of Paragraph 20 the Engineer is to make only "such changes in the drawings and (or) specifications as he may find necessary". If none are "necessary", then none are to be made. And, if Paragraph 20 is to be read as requiring that the Engineer make appropriate notations or entries on the drawings to reflect the nature and extent of the conditions encountered, then his duty to so do must be regarded as mandatory. Surely, the parties to the contract cannot be assumed to have intended that the contractor's right to additional compensation under Paragraph 20 be subject to the whim of the defendant's Engineer—or that a default in duty on the part of this agent of the defendant can deprive the contractor of its rights.

■ On this phase of the appeal we conclude that the District Court erred in its holding that the "changed conditions" clause of the contract affords no basis for recovery by the plaintiff.

With respect to the defendant's affirmative defense of an acceptance of "final payment" which constituted a bar to plaintiff's action for additional compensation, the District Court found that the contract price was $2,946,822; that the payment made pursuant to Estimate No. 38 was made following the completion and acceptance of the work; that said estimate shows as the "total value of the work to date" the sum of $2,956,-678; shows $2,660,986 as the amount of the payments previously made; contains a computation of certain agreed liquidated damages due defendant; discloses a balance of $273,774.15; and thus constitutes a final accounting.[3] The court

---

3. The court made further findings concerning the fact that on defendant's worksheet pertaining to Estimate No. 38 the word "final" was pencilled out, and concerning the testimony of plaintiff's president relative to a conversation he stated he had with defendant's Chief Engineer, prior to plaintiff's letter of May 6, 1964, about defendant withholding a token amount of the retained percentages "so we wouldn't have a mis-

understanding because I knew there was a clause about final payment" and the Chief Engineer's assurance that "there was no problem". But the court concluded that there was scant probative value in the worksheet as an admission on defendant's part, the record being barren as to the circumstances attending the striking out of the word "final" or whether such action was authorized, and that plaintiff's president's interpretation

found that no substantial evidence had been presented which would warrant a conclusion that the defendant had acceded to a waiver of the final payment clause, and concluded that the check for $273,774.15 accepted by the plaintiff on June 18, 1964, must reasonably be construed to constitute a "final payment" under the contract. The court viewed the plaintiff's letters of February 25 and May 6, 1964, quoted supra, as being but ineffective unilateral efforts of the plaintiff to avoid or nullify Article 7 of the contract, applying the principle that a contract may not be modified without the consent of both of the parties.

■■ In our opinion neither the fact that the contract work had been completed and accepted at the time of the acceptance of the June 18, 1964, payment, the arithmetical computations reflected by Estimate No. 38, the language used in identifying the items appearing in the estimate, nor that the estimate appears to reflect a final accounting, are individually or collectively dispositive of the issue as to whether the $273,774.15 check constituted final payment under the contract. Ordinarily whether or not there has been an acceptance of a final payment depends upon the intentions of the parties. F. H. McGraw & Co. v. New England Foundation Co., 1 Cir., 210 F.2d 62, 68; Fredburn Const. Corp. v. City of New York, (1939) 280 N.Y. 402, 21 N.E.2d 370. Such intent, of course, must be determined on the basis of objective factors considered in the light of the attending circumstances.

It is apparent from the record that after the work had been completed and accepted, but no action had been taken on the plaintiff's claim for additional compensation, plaintiff was concerned that it not accept a payment which would bar its claim under Article 7, the "final payment" clause of the contract. In its February 25, 1964 letter plaintiff requested that it be paid all but $10,000 of the retained percentage, and clearly

expressed its intent and position that such a payment "is not to be construed as acceptance of final payment under the provisions of Article 7". The defendant did not proceed to honor that request, and there was nothing at this stage of the matter which indicated that the defendant was receptive to the making of an interim payment which would not be final. Subsequently the defendant asserted its claim for liquidated damages in the amount of $17,800 based on plaintiff's delay in completing the work. The plaintiff agreed to such a deduction but simultaneously gave defendant express notice that plaintiff was not waiving its claim for additional compensation, and, contemporaneously, through its attorneys, outlined a course of procedure for the release to the plaintiff of only a "substantial portion" of the retained monies—thereby adhering to its earlier position that it had no intention of accepting a final payment which would bar its claim.

It was in this posture of the matter that the defendant took action which evidences its intent with respect to the payment it made on June 18, 1964. On May 20, 1964, the defendant in a formal commission meeting considered the recommendations made by its legal advisor. These concurred in the report and recommendations presented by defendant's Chief Engineer; made reference to the proposal advanced by plaintiff's attorneys for release of a "substantial portion" of the retained percentage; recommended that such procedure be approved; and pointed out that plaintiff's claim for additional compensation "is not a part of this transaction". And, it was in this context that the defendant adopted a resolution which approved a payment of $273,774.15 to the plaintiff but directed that $4,117.70 (the balance of the retained percentage) be retained "until such time as the dispute concerning the payment thereof [whether plaintiff was to receive this money or owed it to a

of his conversation with the Chief Engineer falls short of constituting a waiver

of the defendant's rights under Article 7 of the contract.

union pension trust fund] has been resolved". The $273,774.15 was approved for payment on the basis of Estimate No. 38 which bore no formal indicia that it was a "final" estimate. This estimate, unlike those made in connection with the closing estimates on the contracts for other portions of the sewer project, was neither designated as being the "Final" estimate, nor was plaintiff required to acknowledge thereon that it "accept[s] this Final Estimate as payment in full".

It is our conclusion, based on the facts and circumstances disclosed by the record, that the District Court clearly erred in its finding and conclusion that acceptance of the June 18, 1964 payment operates as a bar to plaintiff's action. We are convinced that the record reflects no intention on the part of either the plaintiff or the defendant, at the time Estimate No. 38 was approved and the payment thereunder made, that such payment represented a "final payment" within the meaning of Article 7 of the contract. If the defendant intended otherwise its action in presenting an estimate which, with respect to its being the "final" estimate, was, at best, ambiguous in character, would under the circumstances here presented border on deceit. But we see no basis for so imputing bad faith to the defendant.

Moreover, the retention of the $4,117.-70 to await a resolution of the dispute as to whether plaintiff or the union pension trust fund was to receive it is further evidence that the June 18, 1964 payment was not intended to be the final payment under the contract. A resolution of the dispute in favor of the plaintiff obviously would require a subsequent payment of this $4,117.70 balance of the retained percentage to the plaintiff.

The judgment order appealed from is reversed, and the cause is remanded to the District Court for further proceedings consistent with the holdings made herein.

Reversed and remanded.