**CRUZ CONSTRUCTION COMPANY, INC.**

v.

**LANCASTER AREA SEWER AUTHORITY.**

Civ. A. No. 75–3671.

United States District Court, E. D. Pennsylvania.

Oct. 27, 1977.

---

7. See note 2, *supra*.

MEMORANDUM AND ORDER

TROUTMAN, District Judge.

This is an action by Cruz Construction Company, Inc. (Cruz) for damages for alleged breaches of a construction contract by the Lancaster Area Sewer Authority (the Authority). Cruz has asserted two causes of action, the first alleging underpayment for work completed and the second seeking recovery of damages suffered by Cruz in reliance on certain representations allegedly made by certain agents of the Authority. Before the Court is the Authority's motion for summary judgment as to the second cause of action.

The following facts are uncontradicted:

1. Cruz entered into a contract with the Authority for the construction of a sanitary sewerage system.

2. Included in the contract or incorporated into the contract were various documents, including the conditions and prices stated in the Proposal, General Conditions, Supplemental General Conditions and Special Conditions of the Contract, the Plans, the Specifications and other contract documents (the contract documents).

3. Huth Engineers, Inc. (Huth) was the project engineer and prepared many of the contract documents including the plans and the specifications and supervised construction of the project.

4. Included in the plans were certain test borings or soundings which were plotted at 200 foot intervals and which indicated the level at which rock was first encountered by the contractor making the borings.

5. The contract documents also included an estimate of 8,050 cubic yards as the amount of rock that would have to be removed from trenches that were to be excavated in the course of the construction of the project.

6. Edward Cruz is the Vice President and Chief Operating Officer of Cruz. He first learned of the sewer project by reading about it in the Dodge Reports.

Sally Akan, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

Richard P. Brown, Jr., Philadelphia, Pa., for defendant.

7. Upon learning of the project, Edward Cruz and another officer of the corporation, Evaristo Cruz, picked up available contract documents from Huth, reviewed the documents and inspected the job site with those documents in hand.

8. Cruz bid $10.00 per square foot for removal of rock from trenches within a two-foot pay width.

9. Upon commencement of the work, Cruz encountered rock at much higher levels than were indicated on the test borings shown on the plans. As a consequence, Cruz removed 27,124 cubic yards of rock from the two-foot pay width, not 8,050 as was estimated.

10. The Authority paid Cruz for all of the 27,124 cubic yards of rock removed, at the rate of $10.00 per cubic yard.

11. Cruz advised the Authority and Huth fully as to the difference in the subsurface rock conditions.

12. Cruz was forced to employ more costly and time-consuming techniques to remove the rock because of the greater quantity of rock removed as opposed to that which it would have been obliged to remove had the rock been as indicated by the test borings.

13. Cruz was also required to excavate rock from a greater width than the estimated two-foot pay width, and was, therefore, required to backfill the increased trench area with stone and to pave and restore the surface over a greater than anticipated area.

14. Jack McSherry, who was employed as Chief Construction Engineer, testified in deposition that test borings in Lancaster County were extremely unreliable because of the unpredictable nature of rock in Lancaster County, but there was no warning in the contract documents as to such unreliability. Furthermore, McSherry testified that no test boring results can ever be used to accurately estimate rock quantity unless such borings are taken at five-foot intervals.

15. McSherry testified further that he could not understand why the borings were included in the plans or why the estimate was computed to be 8,050 cubic yards, instead of a round figure such as 8,000 or even 10,000, in light of the extreme unreliability of such test borings in the Lancaster County area.

16. Allen Forbes, Executive Director of the Authority, testified that he was responsible for estimating the quantity of rock and that he based his estimate on the test borings. He also testified that no rock overrun in the entire sewer project was as great as that in this case.

17. Forbes testified further that he was informed during the construction of the sewer that Cruz was encountering more rock than that which had been estimated.

18. Calvin Levis, President of Huth, testified that Huth generally does not utilize test borings because of their great unreliability, and that it was a mistake to include such information in the plans.

19. Elmer Wagner, Vice President of Huth, testified that Huth occasionally makes test borings but does not include such information in plans.

20. Cruz did not obtain a written work order prior to performing the additional work necessitated by the overrun of rock.

21. Cruz did not submit a claim for this work along with its first estimate after completion of its work.

On these facts, Cruz contends that it based its bid of $10.00 per square yard upon the information in the contract documents, including the test borings and the estimate of 8,050 square yards of rock to be removed from the two-foot pay width.

The Authority counters that there are two reasons why Cruz cannot recover. First, the contract documents preclude reliance on the information, and such information is excluded from the contract documents by the terms of the documents. Second, plaintiff was required to obtain a written work order to perform the extra work and was required to submit a claim for this work with the first estimate after the work was completed.

The documents do include exculpatory clauses regarding physical conditions of the construction site. There are four pertinent provision in the "Information for Bidders" section of the specifications. They are:

"10. *CONDITIONS OF WORK*

Each bidder must inform himself fully of the conditions relating to the construction of the project and the employment of labor thereon. Failure to do so will not relieve a successful bidder of his obligation to furnish all material and labor necessary to carry out the provisions of his contract. Insofar as possible the contractor, in carrying out his work, must employ such methods or means as will not cause any interruption of or interference with the work of any other contractor.

\*　　\*　　\*　　\*　　\*　　\*

"17. *OBLIGATION OF BIDDER*

At the time of the opening of bids each bidder will be presumed to have inspected the site and to have read and to be thoroughly familiar with the plans and contract documents (including all addenda). The failure or omission of any bidder to examine any form, instrument or document shall in no way relieve any bidder from any obligation in respect of his bid.

\*　　\*　　\*　　\*　　\*　　\*

"20. *SITE CONDITIONS*

Where information as to soil conditions, test borings, test piles and existing underground and overhead locations is shown on the Engineer's plans, specifications or drawings, or in preliminary reports prepared by the Engineer, such information is for the Owner. The correctness of such information is not guaranteed by the Owner or the Engineer, and in no event shall be considered as a part of the contract, an inducement to bidding or as a factor for computation of bids. If such information is used by a bidder in preparing his proposal, he must assume all risks that conditions encountered in performing work may be different from the approximation shown. If any bidder so desires, the Owner will afford him an opportunity, at his own expense, to make borings or soundings, to drive test piles or to dig test pits properly refilled to the satisfaction of the Owner.

The Contractor shall satisfy himself, by careful examination, as to the nature and location of the work, the character of equipment and facilities needed preliminary to and during prosecution of the work, the general and local conditions, and all other matters which can in any way affect work under this contract.

"21. *APPROXIMATE ESTIMATE OF QUANTITIES*

The bidder's attention is directed to the fact that in contracts based on unit prices the estimate of quantities of work to be done and materials to be furnished under these specifications, as shown on the proposal form and in the contract, is approximate and is given only as a basis of calculation upon which to determine the lowest bidder. The Owner does not assume any responsibility that estimated quantities shall be maintained in the construction of the project, nor shall the Contractor plead misunderstanding or deception because of such estimate of quantities, or the character of the work or location, or other conditions pertaining thereto. The Owner reserves the right to increase or diminish any or all of the above mentioned quantities of work or to omit any of them, as it may deem necessary, and such increase or decrease of the quantities given for any of the items shall not be considered as sufficient grounds for granting an increase in the unit prices bid."

There are also two provisions in the Specifications which deal with the requirements for performance of extra work. One provision reads:

"Without invalidating the contract, the Owner may order extra work or make changes by altering, adding to or deducting from the work, the contract sum being adjusted accordingly. All the work of the kind bid upon shall be paid for at the price stipulated in the proposal, and no claims for any extra work or materials shall be allowed unless the work is ordered in writing by the Owner or its

Engineer, acting officially for the Owner, and the price is stated in such order." A further provision reads:

"No claim for extra work or cost shall be allowed unless the same was done in pursuance of a written order of the Architect/Engineer approved by the Owner, as aforesaid, and the claim presented with the first estimate after the changed or extra work is done. When work is performed under the terms of subparagraph 17(c) of the General Conditions, the Contractor shall furnish satisfactory bills, payrolls and vouchers covering all items of cost and when requested by the Owner, give the Owner access to accounts relating thereto."

 Concerning the applicability of these provisions, Pennsylvania law applies. A federal court must apply the conflict of laws rules of the state in which the court sits. *Klaxon Co. v. Stentor Elevator Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Pennsylvania, the courts look to the law of the place with the most significant relationship to the parties and the transaction. *Neville Chemical Company v. Union Carbide Corporation*, 422 F.2d 1205 (3d Cir. 1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). In this case, the contract was prepared in Pennsylvania, the bids were submitted and opened in Pennsylvania, the contract was signed by the Authority in Pennsylvania, the contract was performed in Pennsylvania, the Authority is a municipal corporation created by Pennsylvania statute, the sewer system was constructed for the benefit of Pennsylvania citizens and Pennsylvania citizens are currently paying for the use of the sewer system. Furthermore, the suit was instituted in Pennsylvania. Accordingly, Pennsylvania law is applicable.

The Authority contends that under Pennsylvania law the exculpatory provisions listed above are controlling and Cruz cannot recover. The two leading Pennsylvania cases are *O'Neill Construction Co. v. City of Philadelphia*, 335 Pa. 359, 6 A.2d 525 (1939)

and *Montgomery v. Philadelphia*, 391 Pa. 607, 139 A.2d 347 (1958). *O'Neill* held that as a general rule "a contractor is presumed, in the absence of an express provision to the contrary, to have assumed the risk of unforeseen contingencies arising during the course of the work, unless performance is rendered impossible by an act of God, the law, or the other party". *O'Neill Construction Co. v. City of Philadelphia, supra*, at 361, 6 A.2d at 526.

Furthermore, there was included in the construction contract in that case a clause which read as follows:

" * * * 'Where borings and underground and overhead structure locations are of record in the Bureau, they were made for the information of the Bureau, as an aid to complying with the provisions of the Act of Assembly of June 25, 1919; their correctness is not guaranteed by the City, and in no event is this information to be considered as a part of the contract. If this information is used by a bidder in preparing his proposal, he must assume all risks resulting from conditions differing from the approximation shown. If the bidders desire to obtain such data, the City will afford them the opportunity at their own expense to make wash drillings, core borings, or dig test pits on the site of the work.' " *Id.* at 363, 6 A.2d at 527.

The Court determined that this clause excluded the information as to test borings, and denied recovery, absent a showing of fraudulent misrepresentation.

In *Montgomery v. Philadelphia, supra*, the contract involved contained the following clause:

" * * * 'Where borings, test piles, and existing underground and overhead structure locations are shown, they are for the information of the City; their correctness is not guaranteed by the City, and *in no event is this information to be considered as a part of the contract.* If this information is used by a bidder in preparing his proposal, he must assume all risks resulting from conditions differing from the approximation shown. If

bidders desire to obtain such data, the City will afford them the opportunity, at their own expense, to make borings or soundings, to drive test piles, or to dig test pits on the site of the work.' * * "
*Id.* at 610, 139 A.2d at 348. (Emphasis in the opinion.)

In that case, the language above was held to have " 'obliterated from the plans', and thus from the contract" the test boring data. *Id.* at 612, 139 A.2d at 350, citing the *O'Neill* case.

■ Despite efforts of Cruz to distinguish the language in the above clauses from the language applicable in this case, especially that of paragraph 20 of the Specifications, we find no real difference. Therefore, absent a factual distinction, we find that the test boring information was excluded from the contract.

Cruz does allege a factual distinction, namely, that agents of the Authority, particularly those whose testimony was mentioned earlier in this opinion, misled Cruz to such an extent that the Authority is liable for a misrepresentation of the facts. Furthermore, Cruz alleges that it did not have sufficient time to conduct its own investigation. Therefore, it contends that there was a constructive fraud worked upon Cruz and that the Authority cannot rely upon such exculpatory language to escape liability.

Cruz cites *Pennsylvania Turnpike Commission v. Smith*, 350 Pa. 355, 39 A.2d 139 (1944) in support of this contention. In *Smith*, there was a misrepresentation as to subsurface conditions and in the opinion of the Court too short a time for the contractor to engage in its own investigation. However, *Smith* is distinguishable because the Court found that the Commission knew of the actual subsurface conditions and knew how false the representations were.

■ In the instant case, there is no indication that the Authority or its agents knew of the level of subsurface rock. It is alleged that some of the agents knew of the

unreliability of test borings, but knowledge of that sort is insufficient. As the Court noted in *O'Neill*, possibility of error is insufficient to show misrepresentation, much less fraudulent misrepresentation. That Court noted that where the borings accurately represent the subsoil conditions where the borings are made, there is no misrepresentation. Therefore, even if the Authority knew that the test boring data was unreliable because of the nature of subsurface rock in Lancaster County, such knowledge is insufficient under *Smith*.

■ Cruz also argues that there is an issue of fact as to the period of time which elapsed from the time when Cruz heard of the project to the closing of bids. Construing all facts favorably to the party against whom this motion is brought, it is possible that there was too little time for Cruz to conduct its own investigation of subsurface conditions. This fact alone, however, does not give rise to constructive fraud. In holding that there was constructive fraud in the case before it, the *Smith* court determined that there was a knowing misrepresentation of subsurface conditions and too little time for the contractor to conduct its own investigation and thus concluded, "Under all the facts of this case, the representations of the Turnpike Commission amount to a constructive fraud upon the contractor and it was proper to award the additional cost incurred by the contractor as a result thereof." *Pennsylvania Turnpike Commission v. Smith, supra,* at 362, 39 A.2d at 143. In this case, there may have existed the element of insufficient time, but the element of knowing falsity is absent. Thus, under all the facts of *this* case, a *Smith*-type recovery is inappropriate.[1]

■ In addition to its contention that the test boring information was excluded from the contract, the Authority maintains that Cruz could not rely on any information regarding subsurface conditions because such

---

1. Cruz cites *Fehlhaber Corporation v. United States*, 138 Ct.Cl. 571, 151 F.Supp. 817 (1957), which held that insufficient time is grounds for exemption of a contractor from exculpatory language. Even if that case is not distinguishable, we decline to follow it because we are bound by the Pennsylvania law cited in this opinion.

reliance was expressly precluded by the contract documents. *Branna Const. Co. v. West Allegheny Joint School Auth.*, 430 Pa. 214, 242 A.2d 244 (1968) held that a contractor had no right to rely on subsurface information where the following conditions were established: (1) the owner assumed no responsibility for test boring information; (2) any information concerning test borings was for the Owner's use only; (3) bidders were to make their own investigations; (4) the project was to be completed on an "unclassified basis" meaning that anything discovered by the contractor after the execution of the contract was to be the sole risk and responsibility of the contractor; (5) information concerning subsurface conditions was furnished to the contractor for his guidance only; and (6) the contractor was responsible for completing the work regardless of the formations encountered.

In the instant case, the contract documents parallel *Branna.* The Authority, in paragraph 21, assumed no responsibility for estimates and in paragraph 20 "obliterated" test boring information. Paragraph 20 held that information was for the Authority's use only, similar to the second *Branna* condition, and paragraph 10 instructed bidders to make their own examinations of construction conditions, similar to condition three. The corresponding language in this case is even stronger than the fifth *Branna* element; the test borings were furnished for guidance, but were not under any circumstances to be "part of the contract, an inducement to bidding or as a factor for computation". The work estimates were only to aid the Owner in determining the lowest bid and were not furnished for the use of the Contractor. This language is even stronger than the corresponding *Branna* language; the information in the documents was not for the contractor's guidance, but was for the Owner's guidance. Paragraph 10 informs the contractor that failure to discover all construction conditions will not relieve it of its contractual duties, similar to element six, above.

Cruz attempts to distinguish *Branna* on two grounds. First, it argues that in *Branna* the contractor was relying only on test borings, whereas in this case Cruz relied on the work estimate and its own visual inspection. Certainly, the Authority cannot be held accountable for impressions Cruz formed as a result of its own inspection. Moreover, the work estimates were expressly deemed to be of use to the Owner and not the contractor. Therefore, this distinction is not controlling.

Cruz also contends that the excavation work in *Branna* was done on an unclassified basis, whereas in this contract the excavation work was to be paid for separately. The only significance to the *Branna* court of the unclassified nature of the excavation work, however, was that all material encountered, including rock and soil, was to be removed regardless of formation; as a consequence, anything discovered by the Contractor after execution of the contract was the sole risk and responsibility of the contractor. In the instant case, the contract documents specifically provided that if any information as to subsurface formation was utilized by the Contractor "must assume all risks that conditions encountered in performing work may be different from the approximation shown". This language is indistinguishable from that in *Branna* as regards the risk of underground rock formation, and we deem the *Branna* holding controlling.

We, therefore, conclude that the information as to test borings was expressly excluded from the contract, and reliance on any type of subsurface information was precluded. Also, we find no evidence of constructive fraud.

■ The Authority further contends that it is not liable because Cruz did not obtain an extra work order prior to performance of its increased work, and did not submit a claim for this work within the specified time. Cruz does not dispute that it secured no order and did not meet the specified deadline for extra work. However, Cruz maintains it is entitled to recovery because the increased work it performed was not "extra work" and, therefore, neither the work order nor the deadline were applicable.

Basically, the claims by Cruz are three-fold: a claim for removal of additional rock, a claim for backfilling of additional trench area, and a claim for extra paving of borough and state roads. The issue is whether performance of this type of work required an "extra work" order or not.

In *Security Painting Company v. Commonwealth*, 24 Pa.Cmwlth. 507, 357 A.2d 251 (1976), the contractor expected to only remove loose and excessively thick paint from bridge surfaces. After work began, however, the contractor was instructed to remove all of the old paint, including sound and adherent paint. The contractor did so without obtaining a written work order, and the Commonwealth Court denied recovery for additional expense.

Cruz contends that *Security Painting* is distinguishable in that the additional work in that case was arguably not required to be done under the contract. As such, it was extra work. In this case, there is no question that all of the extra rock encountered by Cruz had to be removed. Therefore, the removal of that rock was simply an extension of the work contemplated by the contract and was not extra work.

To buttress its argument, Cruz cites *Teodori v. Penn Hills School District Authority*, 413 Pa. 127, 196 A.2d 306 (1964), in which the Court granted recovery by a contractor for increased work resulting from avoiding working in an excavation site until a sub-surface gasoline transmission line was relocated. That case is distinguishable because the controversy in that case was deemed controlled by a "differing conditions" clause. As the Court therein noted in respect to that clause, "The parties obviously contemplated the possibility of the exact type of contingency which arose, and provided for it in the contract". *Id.* at 132, 196 A.2d at 309. If the parties in this case anticipated such a contingency as arose in this case, they did not provide for it with such a provision; in fact, the only contemplation evident from the contract is language which places risk for such contingencies squarely on the contractor.

We hold that the need for writing is applicable in this case. As the Court noted in *Montgomery v. Philadelphia, supra*:

" * * * Municipal construction contracts, whose terms are in large part governed by statute, are designed to provide, from the initial bidding to final completion, for as many reasonably foreseeable contingencies as practicable, to forestall any possible collusion between city officials and contractors and to protect public funds against wanton dissipation. * * * " *Id.* at 616, 139 A.2d at 352.

We find and conclude that the activity engaged in by Cruz was extra work requiring a written work order, and failure to obtain such an order bars recovery.

For all the reasons listed, we will grant defendant's motion for partial summary judgment.