MIDWEST DREDGING
COMPANY, Appellee,

v.

McANINCH CORPORATION,
Defendant,

and

Iowa State Department of
Transportation, Appellant.

No. 85–1063.

Supreme Court of Iowa.

May 11, 1988.

Thomas J. Miller, Atty. Gen., and Mark Hunacek, Asst. Atty. Gen., for appellant.

Patrick M. Roby and Diane Kutzko of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, LAVORATO and ANDREASEN, JJ.

McGIVERIN, Chief Justice.

Defendant, Iowa Department of Transportation (DOT), appeals three of the trial court's conclusions in this non-jury law action. The trial court ruled (1) that DOT did not enjoy sovereign immunity under Iowa Code section 613.11 (1979) from the suit brought by plaintiff-subcontractor Midwest Dredging Co. (Midwest); (2) that Midwest was an intended third-party beneficiary of the contract between DOT and the codefendant-contractor McAninch Corporation; and (3) that DOT breached an implied warranty of the accuracy of its plans and specifications incorporated into the DOT–McAninch contract for dirt removal and transfer in a road construction project. DOT asserts error in each of these conclusions. Midwest cross-appeals, asserting error in the court's denial of Midwest's claim for lost future profits. As to both appeals, we affirm.

I. *Background facts and proceedings.* This case arose out of a highway construction project. McAninch Corporation, a large construction contractor, submitted the winning bid in 1979 on a contract offered by DOT to grade and construct a portion of interstate highway 380 in Cedar Rapids, Iowa. The contract incorporated numerous project plans compiled by DOT's engineers and a 661–page DOT publication entitled "Standard Specifications for Highway and Bridge Construction."

The relevant provision of the contract for the purpose of this appeal is contained in an addendum to the standard specifications. The addendum, entitled Special Provision 244 (SP–244), required that the embankment material to be used as support under the pavement of the highway be

taken from the "Ross Borrow site," also referred to in the DOT plans as borrow C. The city of Cedar Rapids preferred that the DOT not haul the materials over the city streets and risk breaking pipes under the streets. Special Provision 244 therefore required that the material from borrow C be hydraulically dredged at the borrow site and pumped approximately 7000 feet to the construction site through a pipe while the material was still mixed with water. The requirements in SP–244, by express language, were to prevail over the standard specifications.

Before opening the contract to bids, DOT took twenty-one test borings to determine the subsurface conditions in borrow C. Only six of those borings were taken within the actual mapped boundaries of the borrow site. The results of one of those six borings indicated the presence of rock or small "boulders." The remaining borings indicated only sand and small gravel.

Based upon these test results, DOT determined that hydraulic dredging and hydraulic transportation of the embankment material was feasible, and estimated the total contract cost based upon this assumption. DOT also made its test results available to contract bidders for use in calculating their bids. Unknown to those bidders, however, DOT only considered bids within seven percent of its cost estimate.

Although DOT relied on its boring tests to prepare construction plans and to estimate the construction costs, on appeal DOT points to several standard specifications incorporated into the contract which disclaim any guaranty of accuracy in their plans. Standard specification 1104.01 reads:

> For the purpose of design and the preparation of the engineer's estimate, the contracting authority or its representatives may perform a reasonable amount of exploratory work to gain information relative to surface and subsurface conditions relating to types of soil, moisture content, and types and extent of rock strata. This information, when shown on the plans, represents a summary of conditions as of the date the survey was made; it is only an approximate estima-

tion of the site conditions made merely to be suggestive to the contracting authority of construction conditions and quantities and classes of work. The bidder may use this information as he sees fit. The appearance of this information on the plans will not constitute a guarantee that conditions other than those indicated will not be encountered at the time of construction. The bidder is advised that all information concerning the project, compiled by the contracting authority preceding the design is available for his examination at the contracting authority's headquarters.

Additionally, standard specification 1102.09 contains this general disclaimer requiring the contractor to investigate the plans and work site:

> It is the responsibility of the bidder to examine the plans, proposal form, specifications, supplemental specifications, special provisions, the site of the work, and the state of the work of other contracts on the project to assure that all requirements of the contract and the plans are fully understood. It is the bidder's responsibility to satisfy himself as to the nature of the work and *all reasonably ascertainable conditions* which may affect his performance under the contract.

(Emphasis added.)

Despite this general disclaimer, the trial court found that the borrow site was covered with a deep layer of silt that was too soft to support equipment with which a bidder could make its own deeper borings and learn the true subsurface conditions.

McAninch, having no dredging equipment or experience, bid on the DOT contract intending to sublet the dredging work. DOT was also aware that the dredging work might be sublet. At a prebid conference held by DOT, Donald Lind, the president of Midwest, representatives of McAninch, and several other contractors and subcontractors were present to discuss the problem of hydraulic dredging and transportation of the borrow pit contents. Under the contract terms specified by DOT, the contractor could sublet only up to fifty percent of the total work to be done.

Any work designated as a "specialty item," however, could be sublet without counting against the fifty percent limit with the DOT's written consent. The dredging required in SP–244 was a specialty item.

McAninch won the contract on April 18, 1979, and then sublet the dredging work to Midwest on April 26 with DOT's written approval. The subcontract required Midwest to abide by the hydraulic dredging specifications of the DOT contract.

After the silt layer was removed from the borrow, Midwest began dredging operations in September 1979, using equipment of its own design, built in accordance with the information provided by DOT. Almost immediately, Midwest's pump began to encounter problems with rocks too large to fit through the twenty-two inch transfer pipe. Clearing the blockage was time consuming, and each time the pipe was cleared, rocks would block the pipe again a short time later.

After being informed of Midwest's problems, DOT undertook eleven new borings. All but one showed subsurface rock formations extending into the borrow site. DOT recommended dredging at another location within the borrow. At considerable expense, Midwest moved its equipment to the new location, but hydraulic dredging attempts there also proved fruitless. Nevertheless, DOT refused Midwest's subsequent suggestion to haul material by truck to the construction site.

Fifteen additional borings were taken by a soil testing service hired by McAninch the next month and all but one encountered large rocks or "boulders" big enough to disrupt dredging and piping operations.

At the end of November, Midwest presented DOT with a report that borrow C was not hydraulically dredgeable. Various alternative procedures were discussed by DOT and Midwest, but all were rejected by DOT. The trial court found as a fact that Midwest did not fail to perform any economically practicable act to hydraulically dredge the borrow site.

The chief executive officer for McAninch then approached DOT in January 1980 offering his opinion that borrow C could not be hydraulically dredged. DOT continued to disagree. After commissioning the excavation of three more test holes, all of which yielded boulders, DOT executed a change order in March, requiring the embankment material to be hauled by truck.

The next month, Midwest declared itself to be insolvent and unable to complete the DOT contract.

Alleging that losses on this job contributed significantly to its financial problems, Midwest brought suit against DOT and McAninch.[1] The suit alleged (1) that DOT impliedly warranted the accuracy of the plans and specifications contained in its contract with McAninch and that the Ross Borrow pit was hydraulically dredgeable; (2) that Midwest was an intended third-party beneficiary of that contract; and (3) that the State waived sovereign immunity, *see* Iowa Code section 613.11, by virtue of the plans and specifications included in the contract and the work performed in drilling test holes. Finally, the petition sought damages on several theories including loss of future earnings. The future earnings damages were attributable to DOT, Midwest argued, because of the DOT's breach of this contract, which led to Midwest's insolvency.

Based upon its findings of fact, the trial court concluded that Midwest was correct on the first three issues and awarded damages against DOT for certain losses sustained by Midwest, but concluded that losses from this contract were not responsible for Midwest's insolvency. DOT appeals the trial court's judgment on the implied warranty, third-party beneficiary, and sovereign immunity issues. DOT does not challenge the amount of the judgment. Midwest cross-appeals on the issue of lost future earnings resulting from its insolvency.

II. *Sovereign immunity.* This case was tried to the court as a law action and we review for errors at law. Iowa R.App.

---

**1.** The trial court found no liability by McAninch to Midwest. No appeal was taken from that

ruling. Therefore, McAninch is not a party to this appeal.

P. 4. The factual findings of the trial court are binding upon us if supported by substantial evidence and we view that evidence in the light most consistent with the judgment. *R.E.T. Corp. v. Frank Paxton Co.,* 329 N.W.2d 416, 419 (Iowa 1983); Iowa R.App.P. 14(f)(1).

The threshold question in this case is whether DOT is immune from liability for breach of contract. In another context, we generally held in *Kersten Co. v. Dep't of Social Services,* 207 N.W.2d 117 (Iowa 1973), that the state, by entering into a contract, waives its defense of governmental immunity. The legislature specifically waived the DOT's immunity from certain actions in Iowa Code section 613.11 (1979),[2] which states in part:

> The state of Iowa hereby waives immunity from suit and consents to the jurisdiction of any court in which an action is brought against the state department of transportation *respecting any claim, right, or controversy arising out of the work performed, or by virtue of the provisions of any construction contract entered into* by the department.

(Emphasis added.)

█ DOT did considerable work investigating the borrow site and preparing plans and specifications requiring hydraulic dredging and piping of the embankment material in borrow C. Midwest asserts that its claim arises out of work done by it pursuant to the contract provisions required by DOT. The district court agreed. Concluding that Midwest's claim fell squarely within the language of section 613.11, the court stated:

> Plaintiff's cause of action against the I.D.O.T. arises out of work performed by it on the I-380 project under the I.D.O.T.'s mandates set forth in SP-244 calling for hydraulic dredging of borrow C and the plans and specifications prepared by the I.D.O.T. personnel.

In contradiction, DOT cites several federal decisions in which subcontractors were denied standing to sue the government under similar immunity waiver statutes, *see* 28 U.S.C. § 1491; 41 U.S.C. § 602(a), because there was no privity of contract between the subcontractor and the government. *See, e.g., Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed. Cir.1984); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1551 (Fed.Cir. 1983). We find these cases inapposite.

When Iowa Code section 613.11 was enacted in 1963, the title of the bill read:

> An act to waive immunity of the state of Iowa from any action at law or in equity brought to enforce, or to determine a controversy arising out of any contract in which the Iowa state highway commission is a party....

1963 Iowa Acts ch. 324.

Neither the language of section 613.11 nor its title limit suits to parties in privity of contract with the government. On the contrary, the language is carefully worded so as not to limit suits to parties in privity. Third party beneficiary law was well established in Iowa when this code section was enacted. *See, e.g., Iowa Home Mut. Cas. Co. v. Farmers Mut. Hail Ins. Co.,* 247 Iowa 183, 73 N.W.2d 22 (1955). Had the legislature intended to waive immunity only for parties in privity, it could have so stated.

We agree with the trial court's conclusion that DOT does not enjoy sovereign immunity from Midwest's suit.

III. *Implied Warranty.* DOT next asserts error in the trial court's conclusion that the McAninch-DOT contract gave rise to an implied warranty by DOT that its plans and specifications were accurate and that the contents of borrow C could be dredged and piped by hydraulic means.

The doctrine of implied warranty has recently undergone expansion in Iowa. Traditionally, implied warranties of construction in a workmanlike manner and fitness for intended purpose accompanied construction contracts. *See Busker v. Sokolowski,* 203 N.W.2d 301, 303 (Iowa 1972).

---

**2.** This action was filed in 1980. Hence, the applicable statutory section in the 1979 Code was in force.

More recently, we have stated that implied warranty relief is available to resolve long-standing inequities in other areas of the law. *Semler v. Knowling*, 325 N.W.2d 395, 398 (Iowa 1982). The doctrine has been extended in various nonconstruction contexts to protect buyers of goods and services. *See, e.g., Kirk v. Ridgway*, 373 N.W.2d 491, 496 (Iowa 1985) (implied warranty of workmanship in sale of home by builder-vendor); *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 110 (Iowa 1981) (implied warranty that insurance policy would be reasonably fit for its intended purpose); *Mease v. Fox*, 200 N.W. 2d 791, 796–98 (Iowa 1972) (implied warranty of habitability of leased · dwellings); *Drager v. Carlson Hybrid Corn Co.*, 244 Iowa 78, 82, 56 N.W.2d 18, 22 (1952) (implied warranty that corn fit for seed).

In all of these previous Iowa cases, the implied warranty has run from the contractor or the seller of goods and services to the buyer. Midwest asks us to find an implied warranty running the other direction—from the buyer of services (DOT) to the seller (McAninch–Midwest)—based upon the buyer's contract requirements.

Although Midwest's request is unique in Iowa case law, it is not without precedent. Other jurisdictions have faced implied warranty claims by contractors against state agencies, several in very similar factual settings. The majority have found no implied warranty, but for reasons not present in this case. *Compare Cruz Constr. Co. v. Lancaster Area Sewer Auth.*, 439 F.Supp. 1202 (E.D.Pa.1977) (contractor on sewer project could not recover on suit against sewer authority based on alleged representations made by test boring information when test boring plans were expressly not part of the contract); *Ashton Co. v. State*, 9 Ariz.App. 564, 454 P.2d 1004 (1969) (court found no merit in highway construction contractor's allegation of breach of implied warranty by state based upon state's estimate of tonnage of borrow); *J.A. Thompson & Son, Inc. v. State*, 51 Hawaii 529, 51 Hawaii 672, 465 P.2d 148 (1970) (no breach of warranty in highway construction contract because allegedly misrepresentative test boring results should have been clear to any reasonable contractor); *L.J. McNulty, Inc. v. Village of Newport*, 290 Minn. 117, 187 N.W.2d 616 (1971) (alleged misrepresentation of subsurface rock formations on sewer project; no misrepresentation in light of contract-specific subsurface conditions disclaimer); *S & M Constructors, Inc. v. City of Columbus*, 70 Ohio St.2d 69, 434 N.E.2d 1349 (1982) (contractor could not recover from city for unjust enrichment after encountering more subsurface rock than indicated by test borings) *with Bernard McMenamy Contractors, Inc. v. Missouri State Highway Comm'n*, 582 S.W.2d 305 (Mo.Ct.App.1979) (highway construction contractor recovered in suit for breach of warranty of plans because highway commission misrepresented subsurface conditions); *see also Robert E. McKee, Inc. v. City of Atlanta*, 414 F.Supp. 957 (N.D.Ga. 1976) (on summary judgment motion, alleged misrepresentation in quantity of rock found in test borings found to be question of fact).

In factual settings such as these, there is a risk that the contractor will encounter more subsurface rock than was estimated by the contracting authority and, therefore, incur greater expense than anticipated. As a general rule, if the construction contract places that risk with one party, such party must absorb the loss if unexpected conditions arise. *Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 602 F.2d 950, 958 (1979); *McKee*, 414 F.Supp. at 959.

In allocating that risk, courts have universally applied a rule first expounded in a line of Supreme Court cases. The rule provides that the government is not liable to a contractor for breach of implied warranty unless it misrepresents material facts through concealment or false statements. *See United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Christie v. United States*, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914). In essence, this rule establishes that no implied warranty will arise when the government, in good

faith, presents all of the information it has on subsurface conditions to the contractor.

In each of the above listed cases, the contractor sued to recover the additional expenses occasioned by the subsurface rock formations which the state's borings failed to reveal. Because the risk of increased construction costs due to unforeseen conditions was allocated to the contractor under the Supreme Court rule, the contractor did not recover (except in *Bernard McMenamy*, where there was actual misrepresentation).

We believe the case before us is markedly different. The risk to Midwest was not merely additional expense; it was the inability to perform the contract at all. The Supreme Court said in *Spearin*, "Where one agrees to do for a fixed sum, *a thing possible to be performed*, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." 248 U.S. at 136, 39 S.Ct. at 61, 63 L.Ed. at 169 (emphasis added). Here, however, the trial court found that borrow C could not be hydraulically dredged and piped.

■ While DOT does not become an insurer of subsoil conditions merely by providing certain test information to bidders, *see McKee*, 414 F.Supp. at 959, DOT did not merely provide test boring results to Midwest. It went a step further. DOT drew up plans based on its tests, and required that a specific dredging and piping technique be employed. By so doing, DOT impliedly represented that material from borrow C could be hydraulically dredged and piped in accordance with its plans and SP–244. DOT went beyond mere presentation of boring results, and an implied warranty consequently arose. *Cf. McNulty*, 187 N.W.2d at 619 (line between mere presentation of results of borings and the representation of general conditions based on such borings is crossed when owner's engineers show profile maps, or notations on plans, purporting to give subsoil conditions in general); *Condon–Cunningham, Inc. v. Day*, 22 Ohio Misc. 71, 83, 258 N.E.2d 264, 272 (1969) ("If the contractor is bound to build according to plans and specifications

prepared by owner, the contractor will not be responsible for the consequences of defects in the plans and specification.").

Whether an implied warranty arises is usually a question of fact. *Semler v. Knowling*, 325 N.W.2d 395, 399 (Iowa 1982). The trial court found that DOT warranted the accuracy of its plans and specifications through its representation that hydraulic dredging and piping was feasible, and in so doing, assumed the risks of exigencies which would make hydraulic dredging impossible. Substantial evidence in the record supports this finding, and we agree with the trial court.

Our conclusion here does not ignore the DOT's disclaimers in its standard specifications. As the court in *McKee* noted, "general exculpatory clauses which disclaim any responsibility for the accuracy of that data have been held to be of no effect when the positive specifications made by the government were obviously intended to be used by the bidding contractors in formulating their bids." 414 F.Supp. at 959 (citing *Hollerbach*, 233 U.S. at 172, 34 S.Ct. at 556, 58 L.Ed. at 901). The language used by the Supreme Court when addressing this issue in *Spearin* is particularly relevant here. The Court stated:

[T]he insertion of the articles prescribing the character, dimensions and locations of the sewer imported a warranty that if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. *The obligation to examine the site did not impose upon him the duty of making a diligent inquiry into the history of the locality with a view to determining, at his peril, whether the sewer specifically prescribed by the government would prove adequate. The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view.*

*Spearin,* 248 U.S. at 137, 39 S.Ct. at 61, 63 L.Ed. at 169–70 (emphasis added).

Here, the court found that additional borings were not feasible until the silt layer on the borrow was removed. *Cf. Warren Bros. Co. v. NYS Thruway Auth.,* 34 A.D.2d 97, 309 N.Y.S.2d 450 (1970), *aff'd,* 34 N.Y.2d 770, 358 N.Y.S.2d 139, 314 N.E.2d 878 (1974) (state liable for misrepresentation of conditions where inspection would have been unavailing to reveal incorrectness of the representation). It would not have been feasible here to require each bidder to undertake the tremendously expensive procedure of taking test borings just to make a bid. *Accord Condon–Cunningham,* 22 Ohio Misc. at 84, 258 N.E.2d at 274–75. This is in accord with standard specification 1102.99 of the DOT contract that only requires the bidder "to satisfy himself as to the nature of the work and *all reasonably ascertainable conditions* which may affect his performance under the contract." (Emphasis added.)

We agree with the trial court and conclude that it was unreasonable under this record to expect Midwest and McAninch to discover the impossibility of hydraulically dredging and piping borrow C by their own separate deep borings prior to bidding. Thus, we agree with the trial court in giving the exculpatory clauses no effect. *See McKee,* 414 F.Supp. at 960.

No error exists in this assignment.

IV. *Third party beneficiary.* The trial court concluded that Midwest properly could bring suit as a third-party beneficiary of the DOT–McAninch contract.

■ This case presents our first look at third-party beneficiary suits in an owner-contractor-subcontractor situation. A survey of other jurisdictions reveals that a few courts have allowed such claims. *See generally* Comment, *Contracts for the Benefit of Third Parties in the Construction Industry,* 40 Fordham L.Rev. 315 (1971) [hereinafter Comment, *Contracts*]. Of those courts that have allowed such a third-party claim, concepts of equity or justice in light of the nature of the construction industry have guided their decisions. *See, e.g., Flintkote Co. v. Brewer Co.,* 221 So.2d 784 (Fla.Dist.Ct.App.1969); *County of Giles v. First U.S. Corp.,* 445 S.W.2d 157 (Tenn. 1969); Comment, *Contracts.* Other courts have found third-party standing by applying the third-party analysis presented in the Restatement and the Restatement (Second) of Contracts.

In this appeal, both parties focus their arguments on the Restatement language discussed in *Khabbaz v. Swartz,* 319 N.W. 2d 279 (Iowa 1982). In *Khabbaz,* we analyzed a third-party claim using the third-party beneficiary categories defined in Restatement of Contracts section 133 (1932).[3] As other states have found, this type of case does not fit easily within the Restatement analysis.

After the inception of the first Restatement, the "donee" and "creditor" categories proved to be problematic. Various states applied the language differently. *See generally,* Waters, *The Property in the Promise: A Study of the Third Party Beneficiary Rule,* 98 Harv.L.Rev. 1109, 1171–72 (1985). Several courts expanded the categories beyond their intended coverage by allowing recovery to third parties who were neither creditor nor donee beneficiaries while purporting to apply the Restatement. *Id.*

---

**3.** Restatement of Contracts § 133 (1932) reads in part:

(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is ...:

(a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary;

(b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary ...;

(c) an incidental beneficiary if neither the facts stated in Clause (a) nor those stated in Clause (b) exist.

The American Law Institute responded by redrafting the third-party beneficiary section in Restatement Second to conform with the case law developed since the first Restatement. *See* Note, *Third Party Beneficiaries and the Restatement (Second) of Contracts*, 67 Colum.L.Rev. 880, 887 (1982) [hereinafter Note, *Third Party*]. The result, contained in Restatement (Second) of Contracts section 302 (1979), now reads:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

This new section defines "intended" beneficiaries to comprise creditor and donee beneficiaries as well as other categories of third parties not encompassed in the first Restatement. The test to be applied under this section is whether the contract manifests an "intent to benefit" the third party claiming enforceable rights under the contract. *Id.*

While recognizing in a footnote in *Khabbaz* that the Restatement (Second) rejected the creditor and donee categories, *see Khabbaz*, 319 N.W.2d at 285 n. 8, we declined to abandon the first Restatement's approach at that time. Four years later, in *Bridgman v. Curry*, 398 N.W.2d 167, 170–

71 (Iowa 1986), we recognized that *Khabbaz* and section 302 of the Restatement Second were substantially compatible. Noting the experiences of other jurisdictions, and looking particularly to the facts of this case, we now find reason to adopt Restatement (Second) of Contracts section 302 (1981) relating to third-party beneficiaries.

While we adopt this section of the Restatement Second as helpful in resolving the question before us, our decision in *Khabbaz* is still instructional. The intent to benefit test of the Restatement Second is not at odds with most of the language in *Khabbaz*. Where there is conflict, section 302 of the Restatement Second as applied in this opinion is controlling.

The primary question under the Restatement Second is whether the contract manifests an intent to benefit a third party. Of course, parties enter contracts for different reasons, and courts are not in agreement over whether the intent of the promisor, the promisee, or both, should be the rule.[4] As legal commentators have noted, however, the intent of the promisee is generally considered controlling. *Khabbaz*, 319 N.W.2d at 295 n. 9; *see 4 Corbin on Contracts*, § 776, at 16 (1951); 2 S. Williston, *A Treatise on Law of Contracts*, § 356A, at 836 (Jaeger ed.1959); Note, *Third Party*, at 894–97. *But cf. Holbrook v. Pitt*, 643 F.2d 1261, 1270–71 n. 17 (7th Cir.1981) (improper to neglect reasonable expectations of the promisor because consideration to him may vary with number of parties who will have rights under the contract).

The focus in Restatement (Second) of Contracts section 302(1)(b) is clearly on the promisee's intent as indicated by the cir-

---

**4.** Whether there is an intent to benefit a third party is a question of the subjective state of mind of the contracting parties. Subjective intent is particularly difficult to determine. In the third party beneficiary context, one commentator has suggested that courts should require an *intent* to benefit the third party by the promisee, and the *assent* of the promisor to be bound by a contract creating rights in a third party. Note, *Third Party*, at 897. Assent can be judged on objective criteria, he argues, citing Restatement (Second) of Contracts § 19 (1979) which provides in part:

Conduct as Manifestation of Assent

(1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.

(2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents. Given that we gather the promisor's intent from the contract language and the surrounding circumstances, the intent of the promisor *can* be said to be determined objectively.

cumstances. In this case, McAninch was the promisee of the DOT's promise of reliable plans and specifications and hydraulic dredgeability. McAninch's intent is important to our consideration of the contract. However, we need not decide whether the intent of both parties to the contract or just the intent of the promisee is controlling. Under these facts, we conclude there was sufficient intent by both parties to benefit Midwest.

Having said that, we must define what is meant by intent in such contractual settings. Contracting parties may have several purposes or intended results in mind when entering a contract. Obviously, contracting parties enter construction contracts primarily motivated by their own financial gain. The tenth circuit court of appeals has stated, however, that motive is distinct from intent. *See Hamill v. Maryland Cas. Co.*, 209 F.2d 338, 341 (10th Cir.1954) (In the legal sense, intent is the purpose to use a particular means to effect a certain result; motive is the reason which leads the mind to desire the result.). Numerous other courts have found that the intent to benefit oneself and the intent to benefit a third party are not mutually exclusive. *See* Note, *Third Party*, at 893 n. 75. *See generally* Comment, *Contracts.*

As with all contracts, intent, absent ambiguity, is determined by what the contract itself says. Iowa R.App.P. 14(f)(14). As mentioned above, Restatement (Second) of Contracts section 302(1)(b) states that intent can be gathered from the circumstances surrounding the contract. Therefore, we look to the contract itself, and to the circumstances surrounding it, to determine if there was an intent by McAninch and DOT to benefit a third party.

When DOT entered the contract with McAninch, both parties understood that the hydraulic dredging and piping of embankment material required by DOT was to be subcontracted. The dredging was listed as a specialty item to assure that the amount of work done by the subcontractor on that portion of the contract would not count against the fifty percent McAninch was allowed to subcontract. Even before the

contract was opened for bids, DOT's engineers called a meeting to discuss the dredging work and subcontractors, including a representative of Midwest, as well as general contractors were in attendance. McAninch, as the promisee—the promise being the implied warranty by DOT that the borrow pit could be hydraulically dredged in accordance with its plans and specifications—entered the contract with the intent that the eventual dredging subcontractor would benefit from the warranty, and DOT entered the contract knowing that its plans would be used and relied upon by a subcontractor. We conclude that recognizing a right to performance in the subcontractor, Midwest, effectuates the intent of both DOT and McAninch.

Allowing Midwest to bring suit when DOT specifically approved subcontracting the dredging work to Midwest, we believe, is just. Two analogous construction cases reaching similar conclusions provide persuasive reasoning.

Following the first Restatement, the third circuit court of appeals allowed a suit by an owner against a subcontractor in *Sears Roebuck and Co. v. Jardel Co.*, 421 F.2d 1048 (3d Cir.1970). Although the owner ultimately lost on other grounds, the court found that various articles of the contract "explicitly contemplated the provision of services" by the subcontractor to the owner. *Id.* at 1054. The third circuit stated that the owner can sue as a third party beneficiary of the promise from the subcontractor to the contractor "[b]ecause courts have instinctively recognized the creditor's interest in such a promise." *Id.* (citing 2 Williston, *Law of Contracts*, § 131(1)(b) (1932)).

In *Thomas G. Snavely Co. v. Brown Construction Co.*, 16 Ohio Misc. 50, 239 N.E.2d 759 (1968), the contract between the owner and contractor recited that time was of the essence, and set out specific time schedules. The schedules were to apply to "all of the various subtrades." *Id.* at 52, 239 N.E.2d at 760. When failure by the owner to meet the time schedules caused additional expense to one of the subcontractor companies, it brought suit. Over

the owner's claim that the subcontractor was at best an incidental beneficiary, the court allowed the third-party claim. The court did so even though the subcontractors had not yet been hired at the time the contract was made. Noting that the owner would "surely" not have been considered an incidental beneficiary had the subcontractor failed to meet the time schedules, the court stated:

> In fact situations as here, practical realities should not be ignored. Presumably plaintiffs had competition in the bidding for these contracts. Both they and their competitors were entitled to believe that the stated time schedules for performance by the subtrades, the recitations requiring cooperative endeavor, and the provisions that time was of the essence were bona fide and to be taken into consideration when making or attempting to make their subcontracts with [the owner].

*Id.*

Similarly, Midwest was entitled to rely on the DOT's plans and specifications, particularly when the DOT required the subcontractor to perform an impracticable task.

The trial court properly concluded that Midwest was a third-party beneficiary of the DOT–McAninch contract.

**V. *Cross-appeal on lost profits.*** In a cross-appeal, plaintiff Midwest contends that the trial court erred in denying its claim for lost future profits. Midwest claims that losses on the DOT contract caused Midwest to go out of business and, therefore, lose future profits.

The trial court found as a fact that Midwest's insolvency was not caused by the actions of DOT. There was substantial evidence in the record to support this conclusion, including the expert testimony of two accountants indicating that Midwest was in economic straits even before taking this DOT job. Finding substantial evidence to support the trial court's ruling, we are bound by it. Iowa R.App.P. 14(f)(1).

We note that in its appeal, DOT did not challenge the amount of the trial court's

damage award against DOT. We find no reason to disturb or reverse the trial court's damage award.

**VI. *Disposition.*** We conclude that DOT did impliedly warrant the feasibility of hydraulically dredging borrow C in the DOT–McAninch contract, and that Midwest was an intended beneficiary of that contract. Further, we conclude that DOT was not immune from suit under Iowa Code section 613.11 in this case. Finally, we find Midwest's cross-appeal without merit. The judgment of the trial court is affirmed.

AFFIRMED.